Emily FISH and Rodney Fish, Plaintiffs-Appellants,

v.

AMSTED INDUSTRIES, INC., a Delaware corporation, South Bend Lathe, Inc., an Indiana corporation, Defendants-Respondents,

INTERSTATE MACHINERY CO., INC., an Illinois corporation, Defendant-Co-Appellant,

SQUARE D COMPANY, a Michigan corporation and American Hospital Supply Corporation, an Illinois corporation, Defendants.

Supreme Court

*No. 84–1254. Argued September 30, 1985.—*
*Decided November 26, 1985.*

(On certification from the court of appeals.)
(Also reported in 376 N.W.2d 820.)

For the plaintiffs-appellants there were briefs by *Gary R. Kuphall* and *Habush, Habush & Davis, S.C.*, Milwaukee, and oral argument by *Mr. Kuphall.*

For defendants-respondents there was a brief by *Donald H. Carlson, Ahmed J. Quereshi* and *Riordan, Crivello, Carlson, Mentowski & Henderson*, Milwaukee, and oral argument by *Donald H. Carlson.*

DAY, J.  This is an appeal from an order of the circuit court for Manitowoc county, Honorable Fred H. Hazelwood, circuit judge, granting the Defendants', Amsted Industries, Inc. (Amsted) and South Bend Lathe, Inc. (South Bend II), motion for summary judgment on Emily and Rodney Fish's (Plaintiffs) claim of corporate successor liability. We accepted the case upon certification from the court of appeals. This case raises the following issues: Is there sufficient "identity" between the predecessor corporation which manufactured the allegedly defective punch press (Bontrager) and either or both of the successor corporations (Amsted and South Bend II) to justify holding either or both successor corporations liable under products liability law for the alleged defect? If not, should Wisconsin adopt the "product line" exception to impose liability on either or both of the successor corporations?

We conclude that there is not sufficient identity between Bontrager and either Amsted or South Bend II to justify holding them liable for the acts of their predecessor. We decline to adopt the "product line" exception to the traditional rule of no successor corporation liability. Therefore, we affirm the decision of the circuit court.

On October 8, 1979, Emily Fish was severely injured while operating a power press, known as the "Johnson

Mechanical Press," while on the premises of Hamilton Industries, her employer. The press involved here was manufactured by Bontrager Construction Company (Bontrager) in 1957, and was sold to Hamilton Industries by Interstate Machinery Co., Inc., a distributor of the presses.

Johnson Mechanical Presses were originally manufactured by the Johnson Machine and Press Company (Johnson) in Elkhart, Indiana. In 1956, Johnson transferred all of its assets and liabilities to Bontrager. Johnson continued to exist as a wholly owned subsidiary of Bontrager, but it no longer manufactured the presses. The sole share of outstanding stock in the Johnson Corporation was transferred to Bontrager in order to assign to Bontrager all rights to the Johnson trade name. Bontrager began manufacturing the Johnson press line at the Elkhart plant.

In 1962, Amsted acquired all the assets of Bontrager, including all the assets of Johnson (use of the Johnson trade name) via a cash transfer. Bontrager agreed to use its "best efforts" to make its present employees available to Amsted. Amsted agreed to assume only those liabilities of Bontrager that were necessary for uninterrupted business, and it refused to assume Bontrager's tort liabilities arising out of defects in products manufactured by Johnson or Bontrager. None of the officers or directors of Amsted were ever an officer or director of Bontrager or Johnson. However, a Bontrager vice president was employed by Amsted as a plant manager at the Elkhart plant for approximately four years following the transfer.

Amsted manufactured the Johnson press line through its wholly owned subsidiary, South Bend Lathe, Inc. (South Bend I) at the Elkhart plant, using substantially the same manufacturing facilities and equipment that were used by Bontrager and Johnson. However, South Bend I did implement its own general manufacturing

policy, planning procedures and standards, and marketing procedures.

On July 29, 1964, Bontrager was dissolved, and all of its assets were distributed to its shareholders. On August 2, 1965, Johnson was dissolved by Amsted, and its sole asset, the Johnson stock, was distributed to Amsted. On September 29, 1965, Amsted dissolved its subsidiary, South Bend I, but continued to operate it as an unincorporated division under the name South Bend Lathe. South Bend Lathe continued to manufacture the Johnson press. In 1966, Amsted sold the Elkhart plant, and transferred its manufacturing operations to the South Bend, Indiana plant of South Bend Lathe.

In 1975, Amsted sold the Johnson press line business to LWE, Inc., an Indiana corporation, which subsequently changed its corporate name to South Bend Lathe, Inc. (South Bend II). Amsted agreed to indemnify South Bend II for any liability claims arising out of defects in the Johnson press line.

Amsted is no longer involved in the manufacturing of the Johnson press line. South Bend II (an entirely different entity from the South Bend Lathe subsidiary and division of Amsted) continues to manufacture the Johnson press line.

The Plaintiffs brought a products liability claim against Amsted and South Bend II sounding in negligence and strict liability. The complaint alleges that as successor corporations Amsted and South Bend II are liable to the Plaintiffs for the acts of their predecessor corporation, Bontrager, in manufacturing an allegedly defective press.

The circuit court denied Plaintiffs' summary judgment motion asking the court to find, as a matter of law, that Amsted and South Bend II were responsible as successor corporations for the acts of a predecessor corporation. Based on its uncertainty as to the meaning of the term "identity," used by this court in *Tift v. Forage King In-*

*dustries, Inc.*, 108 Wis. 2d 72, 322 N.W.2d 14 (1982) as a basis for imposing liability on successor corporations, the circuit court granted Amsted's and South Bend II's motion for summary judgment, holding that they could not be liable for claims of corporate successor liability.

The court of appeals certified the appeal to this court, raising the issue of whether the *Tift* decision expanded the "mere continuation" exception to the traditional rule of no successor corporation liability elucidated in *Leannais v. Cincinnati, Inc.*, 565 F.2d 437 (7th Cir. 1977).

As a general rule, "a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation." *Leannais*, 565 F.2d at 439. There are four well recognized exceptions to this general rule:

"(1) when the purchasing corporation expressly or impliedly agreed to assume the selling corporation's liability; (2) when the transaction amounts to a consolidation or merger of the purchaser and seller corporations; (3) when the purchaser corporation is merely a continuation of the seller corporation; or (4) when the transaction is entered into fraudulently to escape liability for such obligations." *Leannais*, 565 F.2d at 439.

Both the Plaintiffs and the defendants (Amsted and South Bend II) agree that the traditional exceptions to the general rule of nonliability do not apply to the succession in this case. It is the Plaintiffs' contention that the *Tift* decision expanded the second and third exceptions by setting forth the concept of "identity."

In *Tift*, the plaintiff was injured on October 4, 1975, while using an allegedly defective chopper box that was manufactured in 1961–1962 by a sole proprietorship doing business as Forage King Industries. In 1968, the sole proprietor and another person (the original owner of the business) formed a partnership which shortly thereafter "metamorphosed into a corporation," Forage King Industries, Inc. (Forage King). The proprietor and

former proprietor were the sole shareholders of the corporation which retained the same employees, manufactured the same products, retained the same name and sold to the same dealers as had the sole proprietorship that manufactured the allegedly defective chopper box. *Tift,* 108 Wis. 2d at 74. Late in 1968, the sole proprietor became the sole shareholder of Forage King. On January 30, 1975, Tester Corporation purchased all of the stock of Forage King. The plaintiffs in *Tift* brought an action against Forage King and its insurer, Tester Corporation was not a defendant. The circuit court granted the defendant's motion for summary judgment, finding that none of the exceptions to the general rule applied.

The question posed in the *Tift* case was "whether a business corporation which acquired substantially all of the assets of a predecessor sole proprietorship but which is substantially the same business organization and manufactures an almost identical product as its predecessor may be liable for injuries caused by a defective product manufactured by the predecessor." *Tift,* 108 Wis. 2d at 73. This court answered the question affirmatively. The Plaintiffs in this case argue that this court expanded the exceptions to the general corporate successor rule of nonliability by the following language: "Exceptions two and three to the corporate rule demonstrate that, when it is the same business organization that one is dealing with, whether it be by consolidation, merger, or continuation, liability may be enforced. These are tests of identity." *Tift,* 108 Wis. 2d at 79. Plaintiffs argue that this court relied on two factors to determine if identity exists: whether all the assets of the predecessor were acquired by the successor corporation, and whether the same product was being manufactured by substantially the same manufacturing process throughout the organizational transformations. While a definition of what constitutes "identity" was not provided in *Tift,* the plaintiffs in this case argue that this

court's decision in *Cody v. Sheboygan Machine Co.*, 108 Wis. 2d 105, 321 N.W.2d 142 (1982) is instructive in this regard.

In *Cody*, the plaintiff was injured by an allegedly defective drum sander manufactured by the Sheboygan Machine Company (Sheboygan I). In 1962, Sheboygan Locke, Inc. made a cash purchase of all the assets of Sheboygan I. There was no common identity of officers, directors and shareholders between these two corporations, and the purchase agreement was silent on the issue of the successor corporation's, Sheboygan Locke, Inc.'s, assumption of liabilities. Pursuant to the agreement, the predecessor corporation, Sheboygan I, changed its name to Allester and the successor corporation became Sheboygan Machine Company (Sheboygan II). Sheboygan I dissolved in 1968.

In 1974, Monitor Machine Company, Inc. made a cash purchase of the assets of Sheboygan II, including real estate, customer lists, goodwill, and became Sheboygan Machine Company, Inc., (Sheboygan III). An express nonassumption of liabilities clause was contained in the agreement. Sheboygan III never manufactured the drum sander product line. Only Sheboygan III's possible liability was at issue in *Cody*.

In *Cody*, this court concluded that there was no identity of business organization between Sheboygan I and Sheboygan III, and refused to hold Sheboygan III liable. Plaintiffs, in this case, argue that the sole factual difference between *Tift* and *Cody* that explains the differing results is that in *Cody* the successor corporation never manufactured the product line of the predecessor. Relying on this conclusion, the Plaintiffs claim that this court has expanded the exceptions to the general corporate successor rule of nonliability by considering the "identity" of the predecessor and successor corporations. Identity, according to the Plaintiffs, is identity of assets,

operations and *identity of the product,* rather than identity of ownership.

We agree with the arguments advanced by the defendant and hold that the Plaintiffs are in error in alleging that the *Tift* decision has expanded the exceptions to the rule of nonliability. This court expressly stated that it was applying existing corporate rules to the factual situation in *Tift.*

"A court merely need determine that the defendant, despite business transformations, is substantially the same as the original manufacturer. This is the *application of existing corporate law; and such law governs the decision in this case,* because it is clear that there is identity between the original manufacturer and the present Forage King Industries, Inc." *Tift,* 108 Wis. 2d at 79–80. (Emphasis added.)

Identity refers to identity of ownership, not identity of product line. Since this court applied existing corporate rules in *Tift* to reverse the summary judgment, there was no need to determine whether or not this court should adopt the product line exception. In his dissent, Justice Callow analyzed this exception and stated that he would refuse to recognize it as a means of imposing liability on a successor corporation. *Tift,* 108 Wis. 2d at 91 (Callow, J., dissenting).

In *Tift,* this court was confronted with a situation in which the predecessor was not a corporation, but rather a sole proprietorship. However, this court held that this factor was irrelevant and applied the corporate rules. Direct application of exceptions two or three is impossible when a sole proprietorship is involved because this form of ownership does not have officers, directors and shareholders. The key element in determining whether a merger or de facto merger has occurred is that the transfer of ownership was for stock in the successor corporation rather than cash. *Leannais,* 565 F.2d at 439;

*Tift,* 108 Wis. 2d at 88 (Callow, J., dissenting). In determining if the successor is the "continuation" of the seller corporation, the key element "is a common identity of the officers, directors and stockholders in the selling and purchasing corporations." *Leannais,* 565 F.2d at 440.

Thus, this court considered whether the successor was the same business organization as the predecessor and concluded that Forage King Industries, Inc. was "the continuation of the *same entity* as that operated as a sole proprietorship by Wiberg." *Tift,* 108 Wis. 2d at 80. (Emphasis added). There was identity of management and control throughout the transformation from sole proprietorship to partnership to corporation. Only the form of the business changed; in substance, the identical organization continued to manufacture the same product. This court refused to allow the successor corporation to escape liability when in substance the successor corporation was the same entity as the predecessor sole proprietorship.

In *Cody, Tift's* companion case, this court concluded that there was no identity of business organizations between the predecessor and successor corporations. Though the successor shared the predecessor's name and place of business, the successor corporation was an entirely different corporation. It was a repair and job shop, rather than a manufacturer of drum sanders. There was no identity of management and control throughout the transfers of ownership. Unlike *Tift,* both parties were corporations, and there was "no common identity of officers, directors, and stockholders between the two companies." *Cody,* 108 Wis. 2d at 108. When confronted with a factual situation in which both the predecessor and successor were corporations, this court refused to hold that "identity" exists when exceptions two and three were inapplicable. Since none of the

corporate exceptions were applicable Sheboygan III could not be liable as a successor corporation.

This court continues to apply the existing corporate law to product liability cases. *See, Parson v. Roper Whitney, Inc.*, 586 F. Supp. 1447 (W.D. WI, 1984). Since it is undisputed that the succession in this case does not meet any of the existing exceptions to nonliability, the circuit court was correct in granting the defendants' motion for summary judgment.

Alternatively, the Plaintiffs argue that this court should adopt the "product line" exception of *Ray v. Alad Corp.*, 19 Cal. 3d 22, 136 Cal. Rptr. 574, 560 P.2d 3 (1977) for holding the defendants liable in this products liability action. During oral arguments, both parties agreed that this issue was properly before this court.

■■■ The traditional rule of nonliability of successor corporations and its exceptions were developed prior to the adoption of strict products liability law. 1 L. Frumer and M. Friedman, *Products Liability*, § 5.06[2] (1982); D. Hill, *Products Liability of a Successor Corporation-Acquisition of "Bad Will" With Good Will*, 32 Def. L.J. 55, 56 (1983); *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 815–816 (1981) (involves a similar fact situation).

"Courts have come to recognize that the traditional rule of nonliability was developed not in response to the interests of parties to products liability actions, but rather to protect the rights of commercial creditors and dissenting shareholders following corporate acquisitions, as well as to determine successor corporation liability for tax assessments and contractual obligations of the predecessor." *Ramirez*, 431 A.2d at 815–816. (Citations omitted.)

Some states, California, New Jersey, Pennsylvania and Washington, have found the general rule and its excep-

tions to be too narrow when confronted with a strict products liability action. The purpose of strict products liability is to insure that the costs of any injuries resulting from the use of a defective product are borne by the manufacturer who placed the defective product on the market, rather than by the injured person. *Hickman v. Thomas C. Thompson Co.*, 592 F. Supp. 1282, 1284 (D. Col. 1984); *Ray*, 560 P.2d at 8; *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 63, 27 Cal. Rptr. 697, 701, 377 P.2d 897, 901 (1963). Therefore, these states have adopted the product line exception to nonliability, which has developed to protect the interests of parties involved in a products liability action.

In *Ray*, the plaintiff was injured when he fell off a defective ladder manufactured by the Alad Corporation (Alad I). By means of a cash transfer, the successor corporation (Alad II) acquired all the assets of Alad I, including the Alad name. "Alad II continued to manufacture the same line of ladders under the 'Alad' name, using the same equipment, designs, and personnel, and soliciting Alad I's customers through the same sales representatives with no outward indication of any change in the ownership of the business." *Ray*, 560 P.2d at 5. Shortly after the transfer, Alad I was dissolved. The *Ray* court provided three justifications for imposing liability on Alad II, the successor corporation:

"(1) The virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and (3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business." *Ray*, 560 P.2d at 9.

Based on these justifications, the California court held that a successor corporation which "acquires a manu-

facturing business and continues the output of its line of products under the circumstances here presented assumes strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired." *Ray,* 560 P.2d at 11. After analyzing the pros and cons of the justifications for creating the product line exception, we decline to adopt it.

The policy to be promoted by strict products liability is the protection of otherwise defenseless victims of defectively manufactured products. *Ray,* 560 P.2d at 8; *Dawejko v. Jorgensen Steel Co.,* 290 Pa. Super. 520, 434 A.2d 106, 109 (1981); *Hall v. Armstrong,* 103 Wash. 2d 258, 692 P.2d 787, 791 (1984). It is argued that it would be contrary to this policy to allow a successor corporation to extinguish a plaintiff's rights against the predecessor corporation, and then escape all liability to the plaintiff. The Washington Supreme Court asserted two rationales for the first justification offered in *Ray.* First, the product line rule is one of "necessity;" without it the plaintiff is without a meaningful remedy. Second, it is argued that it is fair to impose liability because it is the successor corporation's acquisition of the predecessor that caused the unavailability of the predecessor as a defendant. *Hall,* 692 P.2d at 791.

Other courts reason that the fact that the plaintiff has lost his remedy against the predecessor and has no one else to sue but the successor is not a justification for suing the successor, but rather it is merely a statement of the problem. "Plaintiff has no remedy because corporate law dictates that the predecessor cannot be liable because it has dissolved." *Manh Hung Ngyen v. Johnson Mach. & Press,* 104 Ill. App. 3d 1141, 433 N.E.2d 1104, 1111 (1982) (involves a similar factual situation); *See also, Downtowner, Inc. v. Acrometal Products, Inc.,* 347

N.W.2d 118, 123 (N.D. 1984). More than just a statement of the problem is required to justify a change in the corporate law.

In accordance with the policy that the cost of injuries resulting from defective products should be borne by the manufacturer who placed the defective product on the market rather than by the injured party, the court in *Ray* considered the successor's ability to assume the original manufacturer's risk spreading function as a justification for imposing liability. The *Ray* rationale assigns the responsibility for injuries caused by a defective product manufactured by the predecessor corporation to the successor who has benefitted from manufacturing the same product line as the predecessor. *Gee v. Tenneco, Inc.*, 615 F.2d 857, 864 (9th Cir. 1980).

"Similarly, because the manufacturer transfers to its successor corporation 'the resources that had previously been available to [the manufacturer] for meeting its responsibilities to persons injured by defects in [products] it had produced,' the successor rather than the user of the product is in the better position to bear accident-avoidance costs." *Ramirez*, 431 A.2d at 821. (Citations omitted.) *See also, Nieves v. Bruno Sherman Corp.*, 86 N.J. 361, 431 A.2d 826, 830 (1981).

It is argued that the successor has virtually the same capacity as the predecessor to estimate the risks of injury from products manufactured by the predecessor and it can protect itself by obtaining insurance coverage or planning some type of self insurance. *Ramirez*, 431 A.2d at 822; *Nieves*, 431 A.2d at 830. Proponents of the product line exception have no problem holding a successor liable for defects in a product it has not manufactured. "Strict products liability is not based upon fault—the successor need not be 'morally' responsible for the defect to incure liability." *Rawlings v. D.M. Oliver, Inc.*, 97 Cal. App. 3d 890, 159 Cal. Rptr. 119, 124 (1979).

Opponents of the product line exception question whether the successor should be responsible for spreading the risk of injury and whether the successor can spread the risk. Ordinarily, strict liability is not imposed on a manufacturer unless it has created or perpetuated the defect. *Leannais*, 565 F.2d at 439; *Jones v. Johnson Mach. & Press Co., Etc.*, 211 Neb. 724, 320 N.W. 2d 481, 484 (1982) (Similar fact situation). In *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 193-198, 342 N.W.2d 37 (1984), this court declined to place liability on drug manufacturers who could not be a cause in fact of the injury to the plaintiff. In *Collins*, the plaintiff's injuries stemmed from her mother's ingestion of the drug DES during pregnancy. This court held that a plaintiff may commence a suit against a defendant who *produced or manufactured* the type of DES taken by the mother of the plaintiff. However, a defendant can escape liability by proving that it did not produce or market the DES which caused the injury to the plaintiff.

If the product line exception is utilized, liability will be imposed on a successor corporation not for something it has done, but rather because it may be able to afford liability. *Nguyen*, 433 N.E.2d at 1111; *Downtowner, Inc.*, 347 N.W.2d at 124. Those courts that refuse to adopt the product line exception do so because: the successor corporation did not create the risk nor did it directly profit from the predecessor's sale of the defective product; it did not solicit the use of the defective product nor make any representations as to its safety; nor is it able to enhance the safety of a product that is already on the market; *Bernard v. Kee Mfg. Co., Inc.*, 409 So. 2d 1047, 1050 (Fla. 1982); *Domine v. Fulton Iron Works*, 76 Ill. App. 3d 253, 395 N.E.2d 19, 23 (1979). *Jones*, 320 N.W.2d at 484; *Ostrowski v. Hydra-Tool Corp.*, 479 A.2d 126, 127 (Vt. 1984).

Furthermore, opponents question whether the successor corporation is able to "spread the risk" of injuries. They see the imposition of the product line exception as an economic threat to small businesses. "Because of their limited assets, small corporations would face financial destruction from imposition of liability for their predecessor's products. . . ." *Bernard,* 409 So. 2d at 1049, *see also, Ostrowski,* 479 A.2d at 127.[1]

"[S]mall manufacturers have a difficult problem obtaining products liability insurance and find it impossible to cover the risks by raising prices because they have to compete with larger manufacturers who can keep the price down. Additionally, it is one thing to assume that a manufacturer can acquire insurance against potential liability for its own products and another to assume it can acquire such insurance for the products made by a different manufacturer." *Nguyen,* 433 N.E.2d at 1111 (citations omitted); *See also, Downtowner, Inc.,* 347 N.W.2d at 124; *Tift,* 108 Wis. 2d at 94–96 (Callow, J., dissenting).

The final justification offered in *Ray* is that the successor who manufactures the same product line as the predecessor benefits from the goodwill and reputation attributed to the predecessor's product line and should bear the costs of liability for any defect in the predecessor's product. "Justice would be offended if a corporation which holds itself out as a particular company for the purposes of sales, would not be estopped from denying that it is that company for the purpose of determining products liability." *Nieves,* 431 A.2d at 830. (Citations omitted.) Fairness requires that a successor who has been benefitted by the legitimate exploitation of the

---

[1] Approximately ninety percent of the nation's manufacturing enterprises are small corporations. *Tift,* 108 Wis. 2d at 94 (Callow, J., dissenting; Comment, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.D. L. Rev. 1000, 1003 (1980).

goodwill earned by a predecessor's product line should bear the burden of costs which would ordinarily be borne by the predecessor. *Hickman,* 592 F. Supp. at 1285; *Ramirez,* 431 A.2d at 822. Furthermore, this consideration precludes a windfall to the predecessor that might otherwise result from an enhanced purchase price paid to the predecessor if successor liability is ignored, and an avoidance of liability by the predecessor for injuries caused after the transfer because the predecessor has dissolved. "Thus, a reduction of the sale price by an amount calculated to compensate the successor corporation for the potential liability it has assumed is a more, not less, accurate measure of the true worth of the business." *Ramirez,* 431 A.2d at 822; *See also, Ray,* 560 P.2d at 11.

Opponents of the product line exception argue that any benefit the successor acquired through the goodwill or reputation of the predecessor's product line was considered and negotiated for at the time of the sale and constituted part of the sale price. To hold the successor liable for defects in products manufactured by the predecessor would be forcing the successor to pay twice for the goodwill of the predecessor. *Nguyen,* 433 N.E.2d at 1112; *Tift,* 108 Wis. 2d at 98–99 (Callow, J., dissenting).

Another argument raised by the opponents is that the party who has benefitted from the sale of the defective product is the predecessor and not the successor. It is the predecessor who has reaped the profits from the sale of the defective product, thus liability should be imposed on the predecessor's profits and not on the profits earned by the successor on products manufactured after the acquisition. *Woody v. Combustion Engineering, Inc.,* 463 F. Supp. 817, 821 (E.D. Tenn. 1978) ; *Tift,* 108 Wis. 2d at 99 (Callow, J., dissenting).

After considering the arguments for and against adoption of the product line exception, we are in agree-

ment with the arguments raised in opposition to the exception. Although strict products liability is a "no-fault" theory of liability, it imposes liability on manufacturers who are responsible for placing the defective product that caused the injury into the stream of commerce. This is not the case with a successor corporation. The successor did not manufacture nor did it place on the market the product that caused the injury. Furthermore, *Ray* and cases citing it as authority have failed to define product line. *See, Tift,* 108 Wis. 2d at 102–103 (Callow, J., dissenting).[2]

We conclude that the legislature is in a better position to make broad public policy decisions in actions based on products liability law. *Holifield v. Setco Industries, Inc.,* 42 Wis. 2d 750, 758, 168 N.W.2d 177 (1969). The questions concerning the effect on the manufacturing business, the potential size and economic strength of successor corporations, the availability of commercial insurance and the cost of such insurance are all questions that we cannot answer. These are the type of questions that the legislature is in a better position to ascertain. If such a basic change in corporate law is to be made it would seem reasonable for the change to come about through legislation rather than by court decision. In *Leannais,* the seventh circuit prudently refused to impose a new theory of liability upon a successor corporation and concluded:

"Courts are ill-equipped, however, to balance equities among future plaintiffs and defendants. Such forays can

---

[2] In *Rawlings,* a California court further muddied the waters by imposing liability on the successor when the product manufactured by the predecessor was made in accordance with the specifications of the customer. "Alad should not be construed so narrowly as to create an exclusive exception to the general rule for successor liability permitting a similar result only in an Alad clone." *Rawlings,* 159 Cal. Rptr. at 124.

result in wide-ranging ramifications on society, the contemplation of which is precluded by the exigencies of deciding a particular case presented on a limited record developed by present parties. . . . As the Wisconsin Supreme Court has recognized, such broad policy issues are best handled by legislatures with their comprehensive machinery for public input and debate." *Leannais,* 565 F. Supp at 441; *See also, Hernandez v. Johnson Press Corp.,* 70 Ill. App. 3d 664, 388 N.E.2d 778, 782 (1979). (Similar fact situation.)

If the liability of successor corporations is to be expanded, we conclude that such changes should be promulgated by the legislature.

Another theory for imposing liability on a successor corporation, "expanded continuation," was established by the Michigan Supreme Court in *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976).[3] In *Turner,* the plaintiff was injured by a press manufactured by the defendant corporation's predecessor. The defendant purchased the entire business, goodwill, name and assets of its predecessor for cash, and subsequently, the predecessor was dissolved. Defendant's motion for summary judgment was granted by the circuit court.

As with the product line theory, the Michigan Supreme Court held that this is a products liability action, and thus products liability policy considerations must be applied. In reversing the summary judgment, the Michigan court considered the same three justifications for imposing liability espoused in *Ray. Turner,* 244 N.W.2d 878–882. The court did not go as far as to adopt the product line exception, but rather, it expanded the "continuation" exception to the traditional rule of successor

---

[3] The plaintiffs, in their motion for summary judgment incorrectly view both *Ray* and *Turner* as product line cases. *Turner* did not apply the product line theory, but rather, it expanded the continuation exception to the general rule of nonliability of successor corporations.

corporation nonliability by removing the distinction between a sale of the predecessor corporation for cash and a sale for stock. The court established the following guidelines to determine if there is sufficient continuity between the predecessor and successor corporations to impose liability on the successor for defects in products manufactured by the predecessor.

"1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and even the Sheridan name.

"2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

"3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

"4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation." *Turner*, 244 N.W.2d at 883–884.

We decline to adopt the "expanded continuation" exception to nonliability for the same reasons that we declined to adopt the product line exception.

*By the Court.*—The decision of the circuit court is affirmed.

LOUIS J. CECI, J. (concurring). I agree with the result reached by the majority. I wish to address briefly, however, a possible upshot of the dissents' conclusion that a successor corporation may be held liable for a predecessor's defective product under products liability law.

There is little justification for generally holding a successor accountable for its predecessor's product de-

fects. And it is no justification for such a conclusion to reason that a small business successor may protect itself from liability by purchasing products liability insurance. Insurance is no longer the apparent panacea which it may have been at one time: where insurance is available at all, its high cost may make it prohibitively expensive for the average business to purchase. For example, South Bend Lathe, Inc. (South Bend II) most likely would have found it impossible to purchase insurance to protect itself from liability for a defective power press which was, at the time of South Bend II's corporate succession, manufactured nearly twenty years earlier.

Where insurance is an unaffordable or unavailable alternative for protection from successor liability, businesses will have an increasingly difficult time selling or transferring corporate assets. In other terms, if the dissents' conclusion ever becomes the law of this jurisdiction, the resulting high cost of insurance will serve as a compelling argument for the enactment of federal products liability legislation.

SHIRLEY S. ABRAHAMSON, J. (dissenting). This case raises a question which this court has not previously addressed: Should a corporation which buys the assets of another corporation and continues manufacturing the product be liable for injury caused by a product that was manufactured and sold by the predecessor corporation?

On October 8, 1979, Emily Fish was injured while operating a "Johnson" power press for her employer Hamilton Industries. The press was manufactured in 1957 by Bontrager Construction Company, which sold its assets to Amsted Industries, Inc., in 1962, and was dissolved in 1964. In 1975 Amsted sold the "Bontrager" assets to South Bend Lathe, Inc., which continued to manufacture presses under the Johnson trade name. In 1978 and

1982, South Bend Lathe sold parts to Hamilton Industries for the press involved in this case.

Applying a traditional rule of corporate law to this tort case, the majority concludes that South Bend Lathe, the successor corporation, is not liable for Emily Fish's injuries.[1] Because the majority's decision contravenes the rationale underlying products liability law in this state,[2] I dissent.

Under traditional corporate law a corporation purchasing the assets of another corporation is not liable for the debts and liabilities of the seller corporation. The genesis of this rule was, at least in part, to protect corporate transferees from unassumed liabilities and to protect commercial creditors and dissenting shareholders when corporate assets were transferred. The traditional

---

[1] By successor corporation we refer in this case to South Bend Lathe which at the time the lawsuit was commenced was producing presses under the Johnson trade name. Amsted's liability arises from its agreement to indemnify South Bend Lathe for any liability claims arising out of defects in the Johnson Mechanical Press.

[2] The Johnson-Bontrager-Amsted-South Bend Lathe transfers have been the subject of several cases raising the issue of successor corporate liability. In addition to the *Ramirez* case discussed by the majority, see *Jones v. Johnson Machine & Press Co., Etc.*, 211 Neb. 724, 320 N.W.2d 481 (1982) (successor corporation not liable under traditional corporate rule); *Korzetz v. Amsted Industries, Inc.*, 472 F. Supp. 136 (E.D. Mich., 1979) (successor corporation liable under *Turner*); *Manh Hung Nguyen v. Johnson Mach. & Press*, 104 Ill. App. 3d 1141, 433 N.E.2d 1104 (1982) (successor corporation not liable under traditional corporate rule); *Ortiz v. South Bend Lathe*, 46 C.A.3d 842, 120 Cal. Rptr. 556 (1975) (successor corporation not liable under traditional corporate rule; expressly overruled by the *Ray* case); *Hernandez v. Johnson Press Co.*, 70 Ill. App. 3d 664, 388 N.E.2d 778 (1979) (successor corporation not liable under traditional corporate rule); *Perez v. Amsted Industries, Inc.* (Massachusetts Superior Court holding successor corporation liable under product line theory, cited in Swartz, *Hazardous Products Litigation*, sec. 6, p. 93, Supp. 12/84).

rule developed outside the context of tort law and prior to the adoption of modern products liability law.

The question then arises whether the traditional rule should be applied to a products liability plaintiff. For the reasons set forth, I conclude that the corporate rule should not be applied in product liability cases.[3]

First, while possibly satisfying the needs of the commercial creditors whose claims arise before or soon after the transfer, the traditional corporate rule is unresponsive to the needs of the products liability plaintiff whose claim may arise years after the product is purchased and the corporate transfer has transpired. Furthermore, while the form of the corporate transfer may have some relevance to the contracting parties, the commercial creditor or the shareholder, it is irrelevant to the injured party.

Second, the traditional corporate rule of successor liability contravenes the fundamental principles of Wisconsin's products liability law. The corporate rule runs counter to the products liability concept of placing the burden on the party most able to bear the loss by spreading the risk.

Underlying Wisconsin's products liability law is a concern "about the just claims of the injured and hapless user or consumer of industrial products. The doctrines of laissez nous faire and caveat emptor have given way to more humane considerations." *Dippel v. Sciano*, 37 Wis. 2d 443, 450, 155 N.W.2d 55 (1967). This court has recognized that manufacturers and distributors of a product, rather than by the injured person, should bear the risk of injury. The manufacturers and distributors

---

[3] For reference to the extensive law review commentary on successor corporate liability, generally critical of applying the traditional corporate rule, see Phillips, *Product Line Continuity and Successor Corporation Liability*, 58 N.Y.U. L. Rev. 906, 906, n. 1 (1983).

are in the best position to spread the risk of injury in the overall cost of the product. Those who reap a benefit from the sale of the product that has caused the injury should bear responsibility for the injury.

Applying this principle to DES manufacturers, the court imposed liability on the manufacturers even though the plaintiff could not prove that the manufacturers produced or marketed the drug which allegedly caused the woman's injury. We explained the imposition of liability as follows:

"[A]s between the injured plaintiff and the possibly responsible drug company, the drug company is in a better position to absorb the costs of the injury. The drug company can either insure itself against liability, absorb the damage award, or pass the cost along to the consuming public as a cost of doing business. We conclude that it is better to have the drug companies or consumers share the cost of the injury than to place the burden solely on the innocent plaintiff." *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 190–192, 342 N.W.2d 37 (1984).

A second underlying principle of our products liability law is that damage awards may act as an incentive for the development of safe products. In the DES case, we justified imposing liability on drug manufacturers because "the cost of damages awards will act as an incentive for drug companies to test adequately the drugs they place on the market for general medical use." *Collins v. Eli Lilly Co., supra* 116 Wis. 2d at 192.

While South Bend Lathe had not manufactured or distributed the alleged defective product causing the injury in this case, the policy reasons discussed above for imposing strict products liability on manufacturers and distributors support imposing liability on South Bend Lathe in this case. South Bend Lathe apparently acquired substantially all the manufacturing assets of the predecessor corporation. South Bend Lathe apparently continued substantially the same manufacturing opera-

tion producing Bontrager's "Johnson Mechanical Press." South Bend Lathe appears to have benefited from Bontrager's accumulated good will, business reputation and established customers. If South Bend Lathe did in fact continue the established business of Bontrager by continuing the manufacture of the same press, South Bend became an integral part of the marketing and manufacturing enterprise that put the alleged defective product on the market and should bear the cost of injuries resulting from the defective product.

Furthermore, imposing liability on South Bend Lathe can also serve as an incentive to the corporation to improve the product. South Bend Lathe had the opportunity to assess the product, perceive any risks and take steps to avoid any risks.

The majority opinion favors letting the legislature decide whether to impose liability on a corporate successor which purchases the assets of a predecessor corporation. I disagree. Tort law has been developed through the common law. The common law is susceptible of growth and adaptation to new circumstances and situations; the common law is not immutable but flexible and adapts itself to varying conditions.[4] In *Bielski v. Schulze*, 16 Wis. 2d 1, 11, 114 N.W.2d 105 (1962), we said that "inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis*, which, if correctly understood, was not static and did not forever prevent

---

[4] *See also Sorenson v. Jarvis*, 119 Wis. 2d 627, 632–634, 350 N.W.2d 108 (1984); *Prah v. Maretti*, 108 Wis. 2d 223, 237–238, 321 N.W.2d 182 (1982); *Moran v. Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 551, 150 N.W.2d 137 (1967); *State v. Esser*, 16 Wis. 2d 567, 581, 115 N.W.2d 505 (1962).

For support of the common law process for resolving legal dispute about products liability law, see ABA, Special Committee on the Tort Liability System, *Towards a Jurisprudence of Injury: The Continuing Creation of a System of Substantive Justice in American Tort Law*, pp. 11–39—11–48 (1984).

the courts from reversing themselves or from applying principles of common law to new situations as the need arose."

This court first recognized a cause of action based on strict products liability in 1967 in the *Dippel* case. The evolution of the common law doctrine of strict products liability has been a matter of continuing concern to the courts. In "passing the buck" to the legislature in this case, the court abdicates its responsibility to develop the common law of this state.

I conclude that the policies underlying modern products liability law are not served by the majority's applying the corporate rule to decide whether liability should be imposed on a successor corporation for a product manufactured and sold by a predecessor corporation. I believe the court should fashion a "product line" rule of successor corporate liability and should reverse the order of the circuit court and remand the case to determine the defendants' liability under such a rule.[5] For the reasons set forth, I dissent.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins this dissent.

WILLIAM A. BABLITCH, J. (dissenting). The majority opinion very thoroughly sets forth the competing policy considerations implicit in the issue presented. I

---

[5] The defendants contend that the imposition of liability on corporate successors would have a devastating effect on the transferability of assets. The majority opinion acknowledges the difficulty of devising a rule that would be equitable to the successor corporation and the injured party. Many of the concerns expressed by the majority might be met by making any rule of successor corporate liability substantially prospective in operation. This limitation on the application of the new rule would provide concerned parties the opportunity to adjust their future conduct and relationships to take into consideration their potential liability. See *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811, 824–25, 826 (1981).

submit that those considerations are reasons to spell out clearly what constitutes a "product line," but not to preclude recovery against a successor corporation for injuries caused by a defective product even when the successor corporation continues to manufacture exactly the same product. Because I conclude that a person who suffers injuries due to a defectively manufactured product should not have to bear the cost of those injuries when the corporation which manufactured the product has dissolved but a successor corporation continues to produce the same product line, I respectfully dissent.

In 1967 this court confronted the important question of who should bear the cost of injuries caused by a defective product, the injured person or the manufacturer of the defective product? This court wisely concluded that the manufacturer of the defective product should bear that cost. *Dippel v. Sciano*, 37 Wis. 2d 443, 458, 155 N.W.2d 55 (1967). *See also Greiten v. La Dow*, 70 Wis. 2d 589, 595, 235 N.W.2d 677 (1975).

Today the majority retreats from that position. It refuses to adopt the product line exception to the common-law rule of no successor corporation liability. Its refusal shifts the costs of injuries caused by a defectively manufactured product from the entity which placed the product on the market to the injured person. This is an unnecessary and unwise retreat from the sound public policy underlying products liability law enunciated in *Dippel*.

In *Dippel* we noted a number of public policy considerations behind strict tort liability for manufacturers of a defective product. The primary policy consideration was that manufacturers are in a better position than users of the product to distribute the costs of the risks created by a defective product through an appropriate pricing system, through the purchase of insurance, or through a form of self-insurance.

This policy consideration is equally applicable to a successor corporate manufacturer of the same product line. The successor corporation is in a better position than a user to distribute the costs of the risk of injury through an appropriate pricing system, purchase of insurance or a form of self-insurance. Perhaps most importantly, to the extent those costs and contingent liabilities are absorbed by the successor, the successor can negotiate a purchase price for the predecessor's business which reflects them.

The inequitable consequences of the court's retreat from its earlier position are easily illustrated by juxtaposing two hypothetical situations. Hypothetical number 1: Widget Corporation manufactures widgets. One of its widgets is defective and causes severe injuries to Mary Smith. Hypothetical number 2 is based on the same facts except that one day prior to Mary Smith's injuries, Widget Corporation sells its business to XYZ Corporation, Widget dissolves and XYZ continues to manufacture the same widgets. Under hypothetical number 1, Widget Corporation bears liability in tort for Mary Smith's injuries. Under hypothetical number 2, because of today's majority opinion, neither Widget Corporation nor XYZ Corporation bears such liability. Mary Smith bears the costs of her injuries.

The inequities of such a result are apparent. Because the majority opinion provides that a successor corporation is not responsible for contingent tort liabilities connected with its predecessor's past production, the price the predecessor receives will reflect only the assets, *not* the contingent liability for future injuries caused by its defective product. Once the predecessor completes an assets-for-cash sale of its ongoing manufacturing operations, it may distribute the proceeds to shareholders and dissolve. Any person subsequently injured by the predecessor's defective product, unable to go against the suc-

cessor manufacturer of the product, will be without a remedy. Under these circumstances, the hapless victim bears the cost of injuries associated with the defective product.

Adoption of the product line exception, on the other hand, would help ensure that the manufacturing entity, and not the injured user, bears the costs of injuries resulting from use of defective products. Successor corporations, on notice that the law requires them to answer for defects in product lines manufactured by their predecessors if they continue to produce those lines, would adjust purchase offers to reflect insurance and/or other costs associated with this liability. The equitable result would be that the predecessor would receive fair value for its ongoing operations, reflecting both assets *and* contingent tort liabilities. Successors would then be positioned to provide adequate insurance coverage for both their predecessor's and their own production. In turn, persons alleging injury from defective products would be able to recover damages upon proof of a legitimate claim.

The majority marshalls the authority on both sides of the debate on adopting the product line exception in a thorough and fair manner. However, I believe that it errs in judgment by not adopting the product line exception. At least two of the majority's grounds for rejecting the product line exception are, in my view, erroneous.

First, the majority suggests that the product line exception would pose an economic threat to small business. Majority opinion at pages 308, 309. *See also Tift v. Forage King Industries, Inc.,* 108 Wis. 2d 72, 94–5, 322 N.W.2d 14 (1982) (Callow, J., dissenting). The conventional wisdom has been that small businesses cannot find or afford insurance coverage for the liability exposure implicit in the exception. Although arguably this may have been true under previous market conditions,

there is evidence that market conditions have changed and that, at any rate, the substantive law of products liability is not a major force affecting the availability of insurance. In addition, recent federal legislation allows businesses to form self-insurance cooperatives and insurance purchasing groups to better manage costs. For a discussion of the effects of the Product Liability Risk Retention Act, 15 U.S.C. Sections 3901–04 (1981), *see,* Smith, *Uniform product liability law—but on whose terms?,* 5 Cal. Lawyer 34, 36 (1985).

Second, the majority argues that such a "basic change" in corporate law of this magnitude should "come about through legislation rather than court decision." Majority opinion at page 310. This argument disregards the fact that the principle of no successor corporation liability is itself a common-law rule developed prior to the adoption of strict products liability principles. More importantly, this argument disregards the duty of this court to give effect to article I, sec. 9 of the state constitution, which provides, in part, that "[e]very person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property or character." This court has interpreted this provision as authority for it to fashion adequate remedies where none exist. *Collins v. Eli Lilly Co.,* 116 Wis. 2d 166, 183, 342 N.W.2d 37 (1984). It should exercise that authority in this case to augment the common-law by adopting a product line exception to the rule of no successor corporation liability.

For the above reasons, I would reverse the decision of the circuit court and remand this case for reconsideration *in accordance with this dissent.*

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN joins in this dissent.