**Christopher M. JOHNSTON and Janice Johnston, Plaintiffs–Appellants,**

**v.**

**AMSTED INDUSTRIES, INC., a Delaware corporation, and South Bend Lathe, Inc., an Indiana corporation, Defendants–Appellees.**

No. 91CA0230.

Colorado Court of Appeals, Div. V.

April 9, 1992.

Kathleen McWhirter Emmett, James F. Frost, Denver, for plaintiffs-appellants.

Fowler, Schimberg & Cowman, P.C., Daniel M. Fowler, Terrence P. Murray, Denver, for defendants-appellees.

Opinion by Judge DAVIDSON.

In this products liability case, plaintiffs, Christopher and Janice Johnston, appeal from the summary judgment entered in favor of defendants, Amsted Industries, Inc., and South Bend Lathe, Inc. Presenting issues of first impression in Colorado, plaintiffs argue that strict products liability should attach to a corporate successor for the defective product of a predecessor under the "product line doctrine" or "continuity of enterprise" exception to traditional corporate law. We reject these arguments and therefore affirm.

The case was submitted to the trial court on stipulated facts. On September 9, 1980, Christopher Johnston's hand was amputated while operating a power press which had been designed, manufactured, and sold by Johnson Machine and Press Corporation in 1948. In 1956, another corporation purchased the assets of Johnson for cash and received one share of stock in Johnson so that it could continue to manufacture and sell presses under the Johnson name. That corporation continued to manufacture and sell "Johnson" power presses from 1956–1962, when it was succeeded by Amsted.

In its purchase agreement in 1962, Amsted bought all of the previous business' assets and liabilities necessary for the uninterrupted continuation of the business, but specifically refused to assume any liability resulting from injuries incurred from the use of presses manufactured and sold by that business. Amsted transferred its assets to South Bend Lathe, which was Amsted's wholly-owned subsidiary. None of the shareholders, directors, or officers of the selling corporation became shareholders, directors, or officers of Amsted or South Bend Lathe.

South Bend Lathe continued to manufacture the "Johnson" power presses until 1975, when Amsted sold all of the assets involving the Johnson presses to LWE Incorporated. LWE Incorporated, then changed its name to South Bend Lathe, Inc.

In April 1981, Christopher Johnston brought this action against South Bend Lathe, Inc., and later against Amsted, asserting claims for strict liability, negligence, and breach of warranty. Janice Johnston asserted a claim for loss of consortium. Acknowledging that he had been injured on a machine which had been manufactured 32 years prior to his injury by a company which had ceased to exist in 1956, Johnston alleged essentially that, because of Amsted's purchase of the business' assets in 1962, defendants should be held liable for his injuries as successor corporations either under traditional corporate law or under theories of strict liability.

On cross-motions for summary judgment, the trial court rejected plaintiffs' arguments. The issues on appeal concern only the trial court's denial of plaintiffs' strict liability claims.

I.

■ Under traditional corporate law, the liability of a successor entity depends on the nature of the transaction which gives rise to the change of ownership. Generally, a corporation that purchases the assets of another corporation is not liable for the debts and liabilities of the seller unless:

(1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

*Ruiz v. ExCello Corp.*, 653 P.2d 415 (Colo. App.1982).

In its summary judgment order, the trial court rejected plaintiffs' claim that liability against defendants as successor corporations fell within the first and third of these traditional exceptions. Specifically, the trial court, noting a disclaimer in the purchase agreement specifically to the contrary, found that Amsted neither expressly nor impliedly agreed to assume the business' debts or liabilities concerning the Johnson presses. Further, based upon the stipulated fact that there was no mixing of officers, directors, or shareholders in any of the five corporate successors or transfers, the trial court found that neither Amsted nor South Bend Lathe, Inc., was a "mere continuation" of the selling corporation. Plaintiff does not contest this part of the trial court's ruling.

## II.

■ In *Ray v. Alad Corp.*, 19 Cal.3d 22, 136 Cal.Rptr. 574, 560 P.2d 3 (1977), the California Supreme Court created the "product line" exception to the traditional rule on nonliability of successor corporations. On the theory that the policies underlying strict tort liability for defective products allowed the imposition of liability on an entity otherwise having no connection with the act causing the injury, the *Alad* court held that "a party which acquires a manufacturing business and continues the output of its line of products [assumes] strict tort liability for defects in units of the same product line previously manufactured and distributed by the entity from which the business was acquired." Plaintiffs, acknowledging that traditional corporate law does not provide them any remedy, argue that we should recognize

this so-called "product line" exception. We decline to do so.

### A.

Preliminarily, insofar as defendants appear to argue that the Colorado Products Liability Act, as presently enacted, precludes judicial recognition of the product line exceptions, we disagree.

Our supreme court adopted the doctrine of strict products liability as set forth in Restatement of Torts (Second) § 402A (1966). In pertinent part, this doctrine is that one who manufactures any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability under certain conditions. "[Manufacturer's] liability in strict tort does not rest upon the normal negligence rules of foreseeability, but upon the newer concept of enterprise liability for casting a defective product into the stream of commerce." *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975).

In 1977, the doctrine of strict liability was codified in the Colorado Products Liability Act, § 13–21–401, et seq., C.R.S. (1987 Repl.Vol. 6A). Its stated purpose is to impose liability on those who create the risk of harm by their involvement in the process which places the defective product in the stream of commerce.

Accordingly, strict products liability, with exceptions not applicable here, is limited to claims against the manufacturer of an allegedly defective product. Section 13–21–402(1), C.R.S. (1987 Repl.Vol. 6A). A "manufacturer" is a "person or entity who designs, assembles, fabricates, produces, constructs, or otherwise prepares a product [prior] to the sale of the product to a user or consumer." Section 13–21–401(1), C.R.S. (1987 Repl.Vol. 6A).

Therefore, by statutory definition, a corporate successor is not a manufacturer of an allegedly defective product, and under this rationale, this court declined to extend liability under the Products Liability Act to successor corporations. "[There] is nothing in the legislative history of the CPLA which indicates a legislative intent to abro-

gate the corporate rule of successor liability as applied to a manufacturer." *Ruiz v. ExCello Corp, supra.*

Citing *Ruiz v. ExCello Corp., supra,* defendants thus contend that insofar as the "product line" exception was developed prior to the enactment of the Colorado Products Liability Act, the General Assembly, by its failure specifically to incorporate the concepts of this product line theory in that act, "considered this theory but chose not to enact it." Plaintiffs argue, however, that *Ruiz v. ExCello, supra,* is not dispositive of the issues here because the question of the adoption of a "product line" exception was not raised in that case.

Although it is highly relevant authority, we agree with plaintiffs that *Ruiz* is not dispositive. Contrary to defendants' argument, at least in relation to the issue of the product line theory, the Colorado Products Liability Act "does not address the liability of successor manufacturers or sellers." *Florom v. Elliott Manufacturing Co.,* 867 F.2d 570 (10th Cir.1989).

### B.

Thus, because the General Assembly has not yet either adopted or rejected the product line theory, we address plaintiffs' contention that considerations of public policy require its judicial recognition.

Numerous courts have considered whether to adopt the product line exception since its promulgation in *Ray v. Alad Corp., supra.* The vast majority have declined to do so. *See Conn v. Fales Division of Mathewson Corporation,* 835 F.2d 145 (6th Cir.1987) (enumerating states which have statutorily adopted product liability but have rejected the product line theory); *Guzman v. MRM/Elgin,* 409 Mass. 563, 567 N.E.2d 929 (1991) (citing, as examples, 14 cases which reject adoption of the product line exception); *Niccum v. Hydra Tool Corp.,* 438 N.W.2d 96 (Minn.1989) (collecting 18 cases).

As synthesized, the reasoning in these decisions is that strict liability should not be imposed because: the successor corporation did not create the risk nor did it directly profit from the predecessor's sale of the defective product; it did not solicit the use of the defective product nor make any representations as to its safety; and it is not able to enhance the safety of a product that is already on the market. *See Bernard v. Kee Manufacturing Co.,* 409 So.2d 1047 (Fla.1982); *Domine v. Fulton Iron Works,* 76 Ill.App.3d 253, 32 Ill.Dec. 72, 395 N.E.2d 19 (1979); *Jones v. Johnson Machine & Press Co.,* 211 Neb. 724, 320 N.W.2d 481 (1982); *Ostrowski v. Hydra-Tool Corp.,* 144 Vt. 305, 479 A.2d 126 (1984); *Fish v. Amsted Industries, Inc.,* 126 Wis.2d 293, 376 N.W.2d 820 (1985).

Moreover, according to these decisions, the exception is inconsistent with basic strict liability principles, *see Guzman v. MRM/Elgin, supra; cf. Ruiz v. ExCello, supra,* results in the imposition of liability without a corresponding duty, *see Downtowner, Inc. v. Acrometal Products, Inc.,* 347 N.W.2d 118 (N.D.1984); *Niccum v. Hydra Tool, supra,* is a drastic departure from traditional corporate law and should be left to legislative action, *see Fish v. Amsted Industries, Inc., supra; Leannais v. Cincinnati, Inc.,* 565 F.2d 437 (7th Cir. 1977), and threatens small successor businesses with economic annihilation because of their predecessor's products. *See Bernard v. Kee Manufacturing Co., supra; see also* A. Schiff, *Products Liability and Successor Corporations: Protecting the Product User and the Small Manufacturer Through Increased Availability of Products Liability Insurance,* 13 U.C.Davis L.Rev. 1000 (1980) ("Most small corporations are unable to secure policies covering liability for injuries caused by the predecessor's products. When such insurance is available, the cost is often prohibitive.").

We agree with this reasoning. We decline to hold a corporate successor liable "not for something it has done, but rather because it may be able to afford [it]." *Fish v. Amsted Industries, supra.*

Plaintiffs argue, however, that adoption of the product line exception is justified because the acquisition by the successor of

the predecessor's business destroys the plaintiff's remedy against the predecessor.

To the contrary, the dissolution of the predecessor corporation does not necessarily leave plaintiffs without a remedy. The Products Liability Act specifically provides that if jurisdiction cannot be obtained over the manufacturer of a defective product, the manufacturer's principal distributor or seller over whom jurisdiction can be obtained will be deemed to be the manufacturer of the product. Section 13–21–402(2), C.R.S. (1987 Repl.Vol. 6A). *Cf. Halter v. Waco Scaffolding & Equipment Co.*, 797 P.2d 790 (Colo.App.1990).

Moreover, it is important here that neither Amsted or South Bend Lathe, Inc., was in any way "responsible" for any "destruction" of plaintiffs' remedy against the original manufacturer; rather, such remedy was cut off by the corporation that purchased the assets of Johnson in 1956. Amsted's purchase agreement with that corporation was six years later. *See Guzman v. MRM/Elgin, supra; Hernandez v. Johnson Press Corp.*, 70 Ill.App.3d 664, 26 Ill.Dec. 777, 388 N.E.2d 778 (1979).

Unlike the situation in *Ray v. Alad Corp.*, *supra*, in which the successor corporation in question was the *immediate* successor to the manufacturer which had placed the defective product into the stream of commerce, here there were five corporate successions or transfers in between the corporation which manufactured and sold the product and the defendants. *See American Law of Products Liability* § 7:28 (1992) (suggesting that the *Ray* theory applies only when the successor causes the elimination of any effective remedy against the predecessor).

We also disagree with plaintiffs' contention that the successor corporation should be required to assume its predecessor's liability because it "has the ability to assume the original manufacturer's risk-spreading role." Whether or not a successor corporation has the ability to gauge the risks of liability, insure against those risks, and spread the costs among the consuming public depends upon a wide variety of factors, such as the potential size and economic strength of successor corporations, the availability of commercial insurance, and the cost of the insurance. *See* Schwartz, *The Federal Government and the Product Liability Problem: From Task–Force Investigation to Decisions by the Administration*, 47 U.Cin.L.Rev. 573 (1978).

Thus, instead, we agree with the reasoning in *Fish v. Amsted Industries, Inc.*, *supra*, in which the Wisconsin Supreme Court concluded that if liability of successor corporations is to be expanded because the successor may be better suited to pay the costs of injuries, it should be done so by the legislature. "These are the type of questions that the legislature is in a better position to ascertain." *Fish v. Amsted Industries, Inc.*, *supra*. *See Domine v. Fulton Iron Works, supra; Guzman v. MRM/Elgin, supra*. *See also* Green, *Successor Liability: The Superiority of Statutory Reform to Protect Products Liability Claimants*, 72 Cornell L.Rev. 17 (1986).

Finally, plaintiffs contend that a successor corporation should be required to assume responsibility for a defective product which it did not manufacture because it enjoys the good will necessarily attached to the product. Plaintiffs argue that Amsted and South Bend Lathe, Inc., "affirmatively exploited" the good will of the Johnson name and that "given the continued manufacture of Johnson's product line and accrued benefit received [by defendants] through good will, the imposition of liability on these successor corporations is not unduly burdensome." We disagree.

First, we cannot ignore the fact that eighteen years elapsed between the purchase of the assets by Amsted and Johnston's injury, and it is undisputed that in the interim there had been numerous lawsuits involving the Johnson products line. *See Korzetz v. Amsted Industries, Inc.*, 472 F.Supp. 136 (E.D.Mich.1979); *Ortiz v. South Bend Lathe*, 46 Cal.App.3d 842, 120 Cal.Rptr. 556 (1975); *Nguyen v. Johnson Machine & Press Corp.*, 104 Ill.App.3d 1141, 60 Ill.Dec. 866, 433 N.E.2d 1104 (1982); *Jones v. Johnson Machine & Press Co., supra; Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 431 A.2d 811 (1981).

Quantifying "good will" under these circumstances is, at least, problematic. *See Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368 (1984) (Pearson, J. dissenting in part) ("the revelation of past production failures injures that good will and deprives the successor of the benefit it has purchased").

More importantly, good will is not an unbargained for benefit which accrues to a successor corporation as a matter of course. On the contrary, the good will of a predecessor corporation is a benefit for which the successor corporation has paid as a component of the purchase price of the predecessor's assets. "To require the successor to assume liability for its predecessor's defective products on the basis of acquired good will would be, in effect, requiring the successor to pay twice for that good will. *Martin v. Abbott Laboratories, supra* (Pearson, J., dissenting in part). *See Guzman v. MRM/Elgin, supra.* ("This argument fails to recognize that the successor paid for the predecessor's goodwill at the asset purchase.") *See* Aylward & Aylward, *Successor Liability for Defective Products—Misplaced Responsibility,* 13 Stetson L.Rev. 555 (1984).

### C.

Accordingly, although a few courts have adopted the *Ray* product line exception, *see Ramirez v. Amsted Industries, Inc., supra; Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106 (1981); *Martin v. Abbott Laboratories, supra,* we elect to follow the overwhelming number of jurisdictions which have rejected it.

### III.

█ Finally, urging similar public policy considerations, plaintiffs argue that we adopt a "continuity of enterprise" exception as a "fifth exception" to the traditional rule of nonliability of successor corporations. Again, we decline to do so.

In *Turner v. Bituminous Casualty Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976), the Michigan Supreme Court, while declining to adopt the *Ray* product line exception, created the so-called "continuity of enterprise"

exception. This exception exists if the totality of the transaction between the successor and the predecessor demonstrates "a basic continuity of the enterprise." Specifically, the *Turner* court held that it is shown when there is:

(1) a continuity of management, personal, physical location, assets, and general business operations

(2) the selling corporation closed its business and liquidated

(3) the purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations and ·

(4) the. successor held itself out to the world as the effective continuation of the selling corporation.

In contrast to the "mere continuation" exception of traditional corporate law, *see Ruiz v. ExCello Corp., supra,* this rule allows liability to be imposed even though the sale of assets is for cash and there· is no continuity of shareholders. It has been characterized as an expansion of traditional *de facto* merger rather than as an exception to the doctrine of successor liability. *See* 1 L. Frumer & M. Friedman, *Products Liability,* § 7.04[5] (1991); *Cyr v. B. Offen & Co.,* 501 F.2d 1145 (1st Cir.1974).

Like the "product line" exception, the "continuity of enterprise" exception has been adopted by a few jurisdictions and rejected by an overwhelming majority. *See Niccum v. Hydra Tool Corp., supra* (listing, for example, Kentucky, Missouri, Nebraska, New York, North Dakota, South Dakota, Vermont, and Wisconsin as rejecting the concept).

Plaintiffs argue that, nonetheless, we should follow *Turner* and find a *de facto* merger under the "continuity of enterprise" exception. We do not agree.

First, we disagree with plaintiffs that the elimination of the requirement of continuity of shareholders to establish a merger is an "insignificant change" in traditional corporate law. To the contrary, "rather than being a meaningless requirement in finding a *de facto* merger, [it] is probably its most

important element." *Nguyen v. Johnson Machine & Press Corp., supra.*

In a traditional merger, the shareholders of the predecessor become the shareholders of the successor. And, in a merger, the liability of the predecessor corporation necessarily becomes that of the successor. *See* § 7–7–105(2)(e), C.R.S. (1986 Repl.Vol. 3A) (the surviving or new corporation shall "be responsible and liable for all the liabilities and obligations of each of the corporations so merged or consolidated"). This is so, in part, because it is the shareholders that ultimately enjoy the profits, if any. Therefore, they cannot move as a group to another corporation to enjoy the continuing profits of the same business earned before merger but escape all possible losses that accumulated before the merger.

On the other hand, in a sale of assets with no continuity of shareholders, all that has transferred is the business. The predecessor corporation is left behind with liabilities and with "money in hand." The imposition of liability in these circumstances defeats the legitimate expectations of the parties held during negotiation and sale. *American Law of Products Liability 3d* § 7:21 (1992). "There is little logic and little justice in requiring the successor to assume the liabilities of the predecessor. The successor has paid a substantial price for the assets of the predecessor, and the law should not require the successor to pay a greater price, especially after the fact of sale when it is impossible for the successor to return to negotiations to change the price." *Nguyen v. Johnson Machine & Press Corp., supra.*

Secondly, the "continuity of enterprise exception," like the product line exception, is inconsistent with the basic tenet of strict products liability that liability be imposed only on the manufacturer that manufactures or markets the product that caused the injury. *See Fish v. Amsted Industries, Inc., supra; cf. Ruiz v. ExCello Corp., supra.* The successor corporation did not create the risk by placing the defective product into the market. *See Niccum v. Hydra Tool Corp., supra.*

Third, we disagree with plaintiffs' argument that this drastic change in corporate law is warranted because, if required to assume the predecessor's liabilities, the successor corporation will be motivated to "seek the introduction of new and improved machinery." Even if this is so, the fact remains that liability will have been imposed on a successor corporation which had no control over products already in use, and which it neither marketed or manufactured. Thus, it is "an ill-considered extension of liability to an entity having no causal relationship with the harm." *Polius v. Clark Equipment Co.,* 802 F.2d 75 (3rd Cir.1986). Here, Amsted discontinued manufacture of the pin clutch line of Johnson presses in 1968, twelve years before Johnston's injury occurred.

Accordingly, for these reasons and for the reasons that we have rejected the "product line" exception, we also decline to adopt the *Turner* "continuity of enterprise" rule. *Accord Florom v. Elliott Mfg. Co., supra; Wallace v. Dorsey Trailers Southeast, Inc.,* 849 F.2d 341 (8th Cir. 1988); *Conn v. Fales Division of Mathewson Corp., supra; Nissen Corp. v. Miller,* 323 Md. 613, 594 A.2d 564 (1991); *Niccum v. Hydra Tool Corp., supra; Downtowner, Inc. v. Acrometal Products, Inc., supra; Hamaker v. Kenwel–Jackson Machine, Inc.,* 387 N.W.2d 515 (S.D.1986); *Ostrowski v. Hydra–Tool Corp., supra; Fish v. Amsted Industries, supra.* But see *Andrews v. John E. Smith's Sons Co.,* 369 So.2d 781 (Ala.1979).

The judgment is affirmed.

STERNBERG, C.J., and PLANK, J., concur.