This is a declaratory judgment action in which the issue is whether a predecessor corporation can be held liable for the payment of damages in the event a judgment *Page 1084 
is entered against the successor corporation in a products liability action involving a product manufactured by the original corporation.
In the underlying products liability action, Lee Earnest Hardy and Ella Belle Hardy sued Goodman Manufacturing Company, Mancha Storage Battery Locomotive Company (a division of Goodman Manufacturing Company), Westinghouse Air Brake Company ("WABCO"),[1] and Goodman Equipment Corporation, seeking to recover damages based on personal injuries caused to Lee Hardy by an allegedly defective mining locomotive known as a "dinky" that was used in the operations at American Cast Iron Pipe Company ("ACIPCO"), where Hardy worked. The products liability action, Hardy v. Goodman [CV-87-3766], which includes counts alleging negligence, wantonness, and violations of the Alabama Extended Manufacturer's Liability Doctrine, is pending in the Jefferson County Circuit Court.
Goodman Equipment filed this action for a declaratory judgment under Ala. Code 1975, § 6-6-223, against Mangood Corporation (formerly Goodman Manufacturing Company) and WABCO, seeking a declaration that WABCO, Mangood, or both, were required to defend, indemnify, and hold harmless Goodman Equipment from the claims asserted by the Hardys.[2] Goodman Equipment later filed a motion for summary judgment, which it was granted, and this appeal followed.
Through discovery, it was determined that the dinky that is the subject of the underlying products liability action was manufactured by Mancha Storage Battery Locomotive Company and was sold to ACIPCO prior to July 10, 1943.
In 1965, Goodman Manufacturing sold certain of the assets of its mining and rock crushing machinery and industrial manufacturing business to WABCO, including the inventory and the right to use the names Goodman Manufacturing Company, Goodman Manufacturing Company of Canada Limited, Diamond Iron Works Division, and Mancha Locomotive Division. Goodman also agreed not to compete in the manufacture and sale of the same type products previously manufactured by Goodman Manufacturing.
After the transfer of assets, the residual business of Goodman Manufacturing Company continued in the name of Mangood Corporation. Under the terms of the 1965 purchase agreement, Goodman Manufacturing (Mangood Corporation), as seller, specifically agreed, as follows:
 "Seller [Goodman Manufacturing Company] agrees that Buyer [WABCO] is not assuming any liability arising out of possible patent infringements by Seller prior to the closing date or for personal injuries or for property damage arising out of the conduct of Seller's business prior to the closing date."
In 1971, WABCO conveyed its interest in the mining equipment and property it had acquired from Goodman Manufacturing to Goodman Equipment Corporation. The 1971 purchase agreement states as follows:
 "15. Indemnity: Seller [WABCO] will indemnify and hold buyer [Goodman Equipment Corporation] harmless against and in respect of:
 "(A) any and all liabilities of the Division or the Manufacturing of any nature, whether absolute, accrued, contingent or otherwise, existing at March 31, 1971 or arising out of any transaction of the Division or Manufacturing on or prior to March 31, 1971, to the extent that such liabilities or obligations were not reflected or reserved against in the consolidated balance sheet of the Division and Manufacturing as of March 31, 1971." (Emphasis added.) *Page 1085 
The trial court granted Goodman Equipment's motion for summary judgment, and declared that, pursuant to the indemnity provisions of the 1971 purchase agreement, if Goodman Equipment is liable to the Hardys in the underlying products liability case, WABCO would be obligated to indemnify and hold Goodman Equipment harmless from the claims asserted by the Hardys regarding the allegedly defective "dinky," the court specifically stating as follows:
 "[I]f the evidence in Civil Action No. CV-87-3766 establishes that the dinky was manufactured prior to March 31, 1971, then Westinghouse Air Brake Company ('WABCO') shall be required to indemnify Goodman from all liabilities which Goodman may be found to have to Lee Earnest Hardy and/or Ella Belle Hardy."
WABCO appeals, and summarizes its argument as follows:
 "WABCO does not have a duty to indemnify Goodman Equipment for a product manufactured and sold prior to 1943 and which allegedly caused injuries in 1985. This is the correct conclusion to be reached after reviewing the 1965 purchase agreement, and, more importantly, the 1971 purchase agreement. In the 1965 purchase agreement between WABCO and Goodman Manufacturing, WABCO refused to accept responsibility for the conduct of Goodman Manufacturing prior to the closing date. That is, WABCO refused to be responsible for personal or property damage caused by products manufactured before 1965. Therefore, when WABCO sold those interests to Goodman Equipment in 1971, WABCO did not have responsibility for the [dinky] which was manufactured and sold prior to 1943."
The following illustrates the chronological order of the various events for a better understanding of this case:
 1900 Goodman Manufacturing Company and Mancha Storage Battery Locomotive Company, a division of Goodman Manufacturing Company, are formed.
1943 Dinky is manufactured.
 1965 WABCO purchases Goodman Manufacturing Company — with residual Goodman Manufacturing Company business operating under the name "Mangood Corporation." In the purchase agreement, it is provided that "[Goodman Manufacturing] agrees that [WABCO] is not assuming any liability . . . for personal injuries or for property damage arising out of conduct of [Goodman Manufacturing's] business prior to [closing date in 1965]."
 1971 Goodman Equipment Corporation purchases WABCO — In the purchase agreement, WABCO promised to indemnify and hold harmless Goodman Equipment against and in respect of "any and all liabilities of the Division or the Manufacturing of any nature, whether absolute, accrued, contingent or otherwise, existing at March 31, 1971."
1985 Date of alleged injury to Hardy.
WABCO admits that, pursuant to the terms of the 1971 purchase agreement, it would be required to indemnify and hold Goodman Equipment harmless from the claims of Mr. and Mrs. Hardy if it had manufactured the dinky in question. However, WABCO contends that because the dinky was manufactured by Goodman Manufacturing Company prior to 1943, "it is not responsible for the allegedly defective product" because it did not purchase Goodman Manufacturing until July 1965, and in the 1965 purchase agreement it expressly disclaimed any responsibility for personal or property damage caused by the conduct of Goodman Manufacturing prior to the closing date of its purchase of the company.
The indemnity clause of the 1971 agreement between WABCO and Goodman Equipment specifically provides that WABCO will indemnify and hold Goodman Equipment harmless from "any andall liabilities . . . whether absolute, accrued, contingent, orotherwise." (Emphasis added.) When a contract, by its terms, is plain and free from ambiguity, it must be enforced as written. See Gray v. Reynolds, *Page 1086 514 So.2d 973 (Ala. 1987), appeal after remand, 553 So.2d 79
(Ala. 1989).
The purchase agreement between WABCO and Goodman Equipment plainly provides that WABCO would indemnify Goodman Equipment for "any and all liabilities" it inherited as a result of the sale. As the Court said in Ivey v. Wiggins, 276 Ala. 106, 159 So.2d 618 (1964), "[t]he word 'all,' in ordinary use, is wholly inclusive as we understand it." We hold that the trial court did not err in concluding that, pursuant to the provisions of the purchase agreement, WABCO owes a duty to indemnify and hold harmless Goodman Equipment Corporation for the underlying tort action involving the claims of Mr. and Mrs. Hardy. It is unnecessary to us to address whether Goodman Manufacturing, by contract, agreed to indemnify WABCO for any "personal injuries . . . arising out of the conduct of [Goodman Manufacturing's] business prior to the closing date" of the sale.
While not specifically pleading it in its complaint, Goodman Equipment argued in its memorandum in support of its motion for summary judgment before the trial court and argued on appeal, that Goodman Equipment could be held liable only as a successor corporation and that liability would necessarily arise from WABCO's continuity of the enterprise of Goodman Manufacturing Company.[3] We agree with the court below that WABCO has a duty to indemnify Goodman Equipment for any liability it may have to the Hardys in the underlying products liability action.
The judgment of trial court is, therefore, affirmed.
AFFIRMED.
HORNSBY, C.J., and SHORES, HOUSTON and KENNEDY, JJ., concur.
[1] In 1968, WABCO became a wholly owned subsidiary of American Standard, Inc., and merged with American Standard, Inc., in 1979. To avoid any confusion, we will refer to the appellants as WABCO.
[2] The claims against Mangood Corporation in Goodman Equipment's complaint for declaratory judgment and WABCO's cross-claim for declaratory judgment were dismissed with prejudice on June 8, 1990.
[3] The liability of a successor corporation under corporation law depends upon the form of the acquisition. Regardless of the denomination of the transaction by the parties, if the acquisition constitutes a de facto merger of the two corporations, the successor remains liable for its predecessor's liabilities. Rivers v. Stihl, Inc.,434 So.2d 766, 771 (Ala. 1983).
In Andrews v. John E. Smith's Sons Co.,369 So.2d 781 (Ala. 1979), this Court adopted the factors enumerated inTurner v. Bituminous Casualty Co., 397 Mich. 406,244 N.W.2d 873 (1976), to rule that a transferee may be held liable for its predecessor's liabilities "where the totality of the transaction demonstrates a basic continuity of the enterprise."Andrews at 785.
The factors considered by the Michigan Supreme Court inBituminous Casualty Co. were:
 "1) There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and even the [seller's] name.
 "2) The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.
 "3) The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.
 "4) The purchasing corporation held itself out to the world as the effective continuation of the seller corporation."
Bituminous Cas. Co., 397 Mich. at 430,244 N.W.2d at 883-84 (cited with approval in Turner v. Wean United,Inc., 531 So.2d 827 (Ala. 1988).