Lattimore & Assocs., LLC v. Steaksauce, Inc., 2012 NCBC 32.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF
JUSTICE
SUPERIOR COURT DIVISION
10 CVS 14744

LATTIMORE & ASSOCIATES, LLC,

          Plaintiff,

v.

STEAKSAUCE, INC. f/k/a
TECHIE, INC., STEVEN E. SMITH,
WORKSMART CHARLOTTE LLC and
WORKSMART, INC.,

          Defendants.

**ORDER & OPINION**

*Rayburn Cooper & Durham, P.A. by David S. Melin and Nader S. Raja for Plaintiff.*

*Williams Mullen by Camden R. Webb and Elizabeth C. Stone for Defendants WorkSmart Charlotte, LLC and WorkSmart, Inc.*

Murphy, Judge.

**THIS MATTER** is before the Court on Plaintiff's Motion for Summary Judgment and Defendants Worksmart Charlotte, LLC and WorkSmart, Inc.'s (collectively, "WorkSmart Defendants" or "WorkSmart") Motion for Summary Judgment, pursuant to Rule 56 of the North Carolina Rules of Civil Procedure. Both motions address Plaintiff's claims for successor liability and piercing the corporate veil.

Having considered the briefs and submissions of the parties, and the arguments and contentions of counsel at the May 1, 2012 hearing, the Court **DENIES** Plaintiff's Motion and **GRANTS** the WorkSmart Defendants' Motion for the reasons set forth herein.

I.

PROCEDURAL HISTORY

{1}    On July 12, 2010, Plaintiff filed its original Verified Complaint against Techie, Inc. ("Techie"), Techie principal Steven E. Smith ("Smith"), Steaksauce, Inc.

("Steaksauce"),[1] and Worksmart, Inc. in Mecklenburg County Superior Court, alleging causes of action for breach of contract against Techie and Smith and a claim for successor liability against WorkSmart, Inc. as purchaser of substantially all of Techie's assets.

{2} On September 15, 2010, Defendant WorkSmart, Inc. filed its Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure.

{3} On November 10, 2010, Plaintiff filed its Motion for Summary Judgment against Smith and Steaksauce (i.e., "f/k/a Techie, Inc.").

{4} On January 5, 2011, Plaintiff obtained a judgment against Smith and Steaksauce for approximately $135,000 plus post-judgment interest and costs.

{5} On March 28, 2011, Superior Court Judge F. Lane Williamson denied WorkSmart, Inc.'s original Motion to Dismiss and granted Plaintiff's Motion for Leave to Amend Verified Complaint. Judge Williamson's Order also enjoined WorkSmart, Inc. from making payments to Steaksauce pending satisfaction of Plaintiff's judgment or pending further order of the court.

{6} On the same day, Plaintiff filed its Amended Verified Complaint (hereinafter, "Complaint"), adding WorkSmart Charlotte, LLC as a defendant to its Fourth Claim for successor liability and adding a Fifth Claim, alleging that WorkSmart Charlotte, LLC is an alter ego of WorkSmart, Inc.

{7} The case was designated as a mandatory complex business case on April 5, 2011, and assigned to this Court on April 6, 2011.

{8} Plaintiff filed its Opposition to Notice of Designation on April 7, 2011. Following briefing by the parties, Business Court Chief Judge Jolly issued an order overruling Plaintiff's Opposition on April 20, 2011.

{9} On May 2, 2011, the WorkSmart Defendants filed their joint Answer, denying all substantive allegations against them.

---

[1] The entity formerly registered in North Carolina as "Techie, Inc." changed its legal name to "Steaksauce, Inc." following the execution of a purchase and asset sales agreement with WorkSmart Charlotte, LLC. As part of the transaction, WorkSmart acquired rights to the name "Techie, Inc." and the Techie logo. (Def.'s Mot. Summ. J. Ex. 11.)

{10}     Following discovery, the parties filed their respective Motions for Summary Judgment with accompanying affidavits, briefs, and exhibits.  The Court heard oral argument on both Motions on May 1, 2012.

II.

FACTUAL BACKGROUND

{11}     Summary judgment is improper where findings of fact are necessary to resolve an issue of material fact. *Collier v. Collier*, 204 N.C. App. 160, 161–162, 693 S.E.2d 250, 252 (2010) (citing *Hyde Ins. Agency v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–165 (1975)).  However, for the aid of the parties and the courts, the trial court may provide a summary of material facts that it finds to be uncontroverted in deciding the motion. *Id.*  The facts that follow are undisputed in the record.

{12}     Smith is the principal, and virtually the sole,[2] shareholder of the corporation formerly registered in North Carolina as Techie and now registered as Steaksauce.

{13}     On June 24, 2008, Techie entered into a sixty-three month commercial lease with Plaintiffs for the premises at 2102 Cambridge Beltway Drive, Suite D, Charlotte, North Carolina, 28273 ("Suite D").  (Compl. Ex. A 8–9, 39, 60–61.)  Smith executed the lease both as Techie's principal and individually as surety.

{14}     On December 16, 2009, Plaintiff and Techie executed a First Lease Amendment to Substitute Premises ("Amendment") wherein Techie agreed to vacate Suite D in favor of a smaller office space within the same commercial property ("Suite A-1").  In a section entitled "Past Due Rent," the Amendment provided that Techie "currently owes [Plaintiff] the sum of $22,237.15 in past due Minimum Annual Rent."  This section also included a schedule for repayment of the

---

[2] The undisputed evidence before the Court is that Smith has been, at all times relevant to this action, the owner of ninety-eight percent of the shares of the corporation formerly known as Techie (now Steaksauce).  (Def.'s Mem. Supp. Mot. Summ. J. Ex. 2-D 2.)  The remaining two percent of Techie (now Steaksauce) shares is owned by Mary Louise Fodera, whereabouts unknown.  (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 2-D 2.)

past due rent.  The Amendment left undisturbed the sixty-three month term of the original lease.  (Compl. Ex. A 64–66.)

{15}    Prior to March 2010, Techie and the WorkSmart Defendants were competitors in the provision of information technology support to businesses in the Charlotte area.  (Def.'s Mot. Summ. J. 2.)

{16}    Beginning no later than December 2009,[3] WorkSmart, Inc. President Ronald Unger[4] and Smith "engaged in a series of communications" regarding the possible sale of certain of Techie's assets, including client contracts.  (Def.'s Mot. Summ. J. Ex. 1, 3.)

{17}    In early 2010, WorkSmart, Inc. made a more formal due diligence investigation into the purchase of Techie assets "during which WorkSmart reviewed and analyzed TECHie's financial documents, articles of organization, other corporate documents, and certain vendor and client contracts."  (Def.'s Mot. Summ. J. Ex. 2, 1; Def.'s Mot. Summ. J. Ex. 3, 11–12.)

{18}    In the course of its investigation, WorkSmart discovered that Techie's equity and net income had declined from 2007 to 2010.  WorkSmart concluded that Techie was experiencing financial difficulty.  (Def.'s Mot. Summ. J. 2; Def.'s Mot. Summ. J. Ex. 2-C.)

{19}    WorkSmart, Inc. representatives inquired of Smith about Techie's open liabilities and learned that Techie had an outstanding line of credit with Wachovia Bank ("Wachovia"), secured by personal guarantees of Smith and his then-father-in-law, Chris Kollman ("Kollman").  Techie also owed Kollman a substantial additional

---

[3] In his Rule 30(b)(6) deposition as representative of the WorkSmart Defendants, Ronald Unger acknowledged that WorkSmart [Inc.] and Techie entered a Mutual Non-Disclosure Agreement on December 16, 2009 (Pl.'s Mot. Summ. J. Ex. 2, 18), the same day Techie and Plaintiff executed the Amendment.  (Compl. Ex. A 64.)

[4] Unger is both the president and CEO of WorkSmart, Inc. and president (and manager) of WorkSmart Charlotte LLC.  (Pl.'s Mot. Summ. J. Ex. 2, 4.)  Plaintiffs allege that WorkSmart Charlotte LLC is an alter ego of WorkSmart, Inc.  (Compl. ¶¶ 39–40.)  While the WorkSmart Defendants nominally contest this characterization of the relationship between the two companies (Def.'s Mem. Supp. Mot. Summ. J. 15), Unger's Rule 30(b)(6) deposition testimony concedes that he uses the names "WorkSmart" and "WorkSmart Charlotte" "interchangeably."  (*See, e.g.,* Pl.'s Mot. Summ. J. Ex. 2, 13.)

debt[5] on a personal loan secured by all of Techie's accounts receivable and other assets. (Def.'s Mot. Summ. J. Ex. 1 ¶ 17.)

{20} Kollman actively participated in negotiations between Techie and the WorkSmart Defendants (*see* Def.'s Mot. Summ. J. Ex. 2-B; Pl.'s Mot. Summ. J. Ex. 2, 19–21), and Kollman ultimately "agreed to release his security interest in TECHie's assets to secure cash from the sale of those assets to pay down TECHie's debts." (Def.'s Mot. Summ. J. 3.)

{21} At some point before WorkSmart Charlotte, LLC purchased Techie's assets, the WorkSmart Defendants became aware of Techie's existing lease with Plaintiff. (*See* Pl.'s Mot. Summ. J. Ex. 2, 42.) The WorkSmart Defendants, however, deny being aware of Techie's arrears with Plaintiff because the unexecuted version of the Lease Amendment Smith provided to them did not include a statement of past due rent. (Def.'s Mot. Summ. J. Ex. 2-A.) Furthermore, no liability for rent or past due rent appeared on the balance sheets Techie provided for the WorkSmart Defendants' review. (Def.'s Mot. Summ. J. Ex. 2-C.) After being prompted by WorkSmart, however, Smith acknowledged in a revised Disclosure Statement the possibility that Plaintiff would sue Techie and Smith if he (Smith) could not come to terms with Plaintiff about Techie's anticipated lease default on Suite A-1. (Def.'s Mot. Summ. J. Ex. 2-B.)[6]

{22} WorkSmart Charlotte, LLC entered into an Asset Purchase Agreement ("APA") with Techie on March 1, 2010.[7] The APA and accompanying bill of sale

---

[5] Techie's Balance Sheet as of January 31, 2010, showed the balance on the note to Kollman as $118,006.93. (Def.'s Mot. Summ. J. Ex. 2-C 6.)

[6] In a February 26, 2010, e-mail correspondence, Ricky Ayers of WorkSmart wrote to Smith: "Steven, given that the lease is in TECHie's name, please add any lawsuits (anticipated or otherwise) regarding that." (Def.'s Mot. Summ. J. Ex. 2-B.) In the revised Disclosure Schedule submitted in reply, Smith stated: "The only Legal issue that may arise would be if I cannot come to a settlement Agreement on breaking the Lease on our current office space, the Landlord may exercise his right to sue me regarding the surety agreement I signed." (Def.'s Mot. Summ. J. Ex. 2-B.)

[7] While the parties dispute whether this agreement constituted a true purchase and sale of Techie assets or a wholesale acquisition of Techie (or, alternatively, a de facto merger of Techie and WorkSmart), it is undisputed that the agreement the parties executed on March 1, 2010 was entitled "Asset Purchase Agreement." (Def.'s Mot. Summ. J. Ex. 1-A 1.)

commemorated a sale of the following assets to WorkSmart Charlotte, LLC: Techie's software and databases pertaining to clients, accounting, and customer service; selected Techie accounts receivable per an attached schedule; eleven client contracts representing recurring gross monthly revenue of approximately $15,000 (i.e., gross annual revenue of approximately $179,000); and Techie's customer lists. (Def.'s Mot. Summ. J. Ex. 1-A.)

{23} Ronald Unger executed the APA for WorkSmart Charlotte, LLC, and Smith executed it for Techie. (Def.'s Mot. Summ. J. Ex. 1-A 16.)

{24} The APA expressly provided for WorkSmart Charlotte, LLC to make an upfront cash payment of $45,000 to Techie, all of which was allocated to "accounts receivable." (Def.'s Mot. Summ. J. Ex. 1-A 3–5, 75.) Consideration for the APA also included additional monthly "variable payments" totaling between $60,000 and $150,000, with the actual variable payment amounts to be calculated based on the revenue derived from accounts serviced by Techie during the six months prior to the effective date of the APA, less certain adjustments.[8] (Def.'s Mot. Summ. J. Ex. 1-A 3–4.)

{25} As a term of the APA, Techie agreed to indemnify and hold harmless WorkSmart Charlotte, LLC from various sources of potential liability, including: material misrepresentations by Techie in the APA; claims against WorkSmart Charlotte, LLC as to any rights asserted by third parties regarding the acquired assets; claims against WorkSmart Charlotte, LLC with respect to acts or omissions of Techie; and claims for compensation owed to any employees with respect to their prior employment with Techie. (Def.'s Mot. Summ. J. Ex. 1-A 11–12.)

---

[8] The prescribed adjustments were to reduce the variable payments in accordance with: the actual value of purchased accounts receivable; balances of any such accounts not collected within 12 months of the effective date; and certain other bases for further reduction, including outstanding wages or other consideration owed by Techie to its employees, open payables on four enumerated Techie vendor contracts, and "any claims, attorneys' fees and damages incurred by Purchaser against Seller" under the indemnification provisions of the APA. (Def.'s Mot. Summ. J. Ex. 1-A 4, 11–12, 73.)

{26}   The APA also included, in a schedule containing a section captioned "No Lawsuits," notice that a "potential legal issue" could arise between Techie and Plaintiff.  (Def.'s Mot. Summ. J. Ex. 1-A 18.)

{27}   The APA further provided that Smith would enter a non-competition and non-solicitation agreement with WorkSmart Charlotte, LLC that would be effective for three years from the end of his employment with Techie.  (Def.'s Mot. Summ. J. Ex. 1-A 10.)  WorkSmart also required Kollman, who was not a Techie shareholder at the time, to sign a similar agreement as a condition of the APA.  (Def.'s Mot. Summ. J. Ex. 3, 40.)

{28}   Because the WorkSmart Defendants wanted to be certain that Techie applied the $45,000 upfront cash payment to Techie's Wachovia line of credit (Pl.'s Mot. Summ. J. Ex. 4, 13), they required that the check be issued jointly to Techie and Wachovia.  (Pl.'s Mot. Summ. J. Ex. 4, 32.)  WorkSmart, Inc. supplied the funds for the upfront cash payment.  (Pl.'s Mot. Summ. J. Ex. 2, 8.)

{29}   On March 2, 2010, Smith sent an e-mail to Frank Bass of Bissell Patrick, Plaintiff's property manager, informing Bissell Patrick that Techie had failed as a business.  (Def.'s Mot. Summ. J. Ex. 10.)  In the e-mail, Smith wrote that Kollman had "lost over $120,000 on TECHie and I [Smith] am left with nothing" (Def.'s Mot. Summ. J. Ex. 10); and that Smith had "found another company to service our customers and take over the [accounts receivable] however this was not even enough to pay off my bank loans which [Kollman] also guaranteed."  (Def.'s Mot. Summ. J. Ex. 10.)  In closing, Smith wrote, "I have nothing more I can do and my personal credit is already ruined so I have removed everything I could from the office [i.e., Suite A-1]."  (Def.'s Mot. Summ. J. Ex. 10.)

{30}   After WorkSmart and Techie executed the APA, a number of Techie employees, including Smith, were hired to positions with the WorkSmart Defendants.  (Pl.'s Mot. Summ. J. Ex. 2, 14.)  While Plaintiff argues in its opening brief, without any supporting allegations, that Smith "continued to oversee former Techie clients" after accepting employment with WorkSmart (Pl.'s Br. Supp. Mot. Summ. J. 17), there is no evidence before the Court that Smith was at any time an

owner, officer, director, or manager of either of the WorkSmart Defendants.[9] (*See* Def.'s Mot. Summ. J. Ex. 1 ¶ 19.) Taking Plaintiff's unsupported contention of fact in the light most favorable to Plaintiff, the Court does not presume to equate the mere oversight of work-related activities with management of an organization. Smith's employment with the WorkSmart Defendants was terminated in August 2010. (Def.'s Mot. Summ. J. Ex. 1 ¶ 20.)

{31} In internal communications to employees (including those newly hired from Techie), and in initial communications with Techie customers, the WorkSmart Defendants characterized their purchase of Techie assets as a "merger." (Def.'s Mot. Summ. J. Ex. 3, 36; Pl.'s Mot. Summ. J. Ex. 4, 48.)

{32} Although the parties dispute the value of assets retained by Steaksauce following the execution of the APA, it is undisputed that Steaksauce retained some Techie assets, including certain accounts receivable, computer hardware, and company vehicles. (Def.'s Mot. Summ. J. Ex. 1 ¶ 11.)

{33} WorkSmart, Inc. admits that some of its employees "have referred to Steaksauce as a 'shell corporation.'" (Pl.'s Mot. Summ. J. Ex. 3 ¶ 27.)

{34} The WorkSmart Defendants performed some work for Techie clients under the terms of existing, non-assignable Techie contracts. (Pl.'s Mot. Summ. J. Ex. 6, 8; Pl.'s Mot. Summ. J. Ex. 4, 74.) Without exception, WorkSmart later renegotiated these contracts directly with the former Techie clients. (*See, e.g.,* Pl.'s Mot. Summ. J. Ex. 5, 7; Pl.'s Mot. Summ. J. Ex. 7, 5.)

{35} The WorkSmart Defendants concede that WorkSmart Charlotte, LLC "pays its bills through sharing services and staff with [WorkSmart, Inc.]." (Pl.'s Mot. Summ. J. Ex. 2, 8.) Furthermore, WorkSmart Charlotte, LLC has no employees (Pl.'s Mot. Summ. J. Ex. 2, 8) and no bank account (Pl.'s Mot. Summ. J. Ex. 2, 8); revenue from WorkSmart Charlotte, LLC flows directly to WorkSmart, Inc. (Pl.'s Mot. Summ. J. Ex. 2, 8); and WorkSmart, Inc. pays WorkSmart Charlotte,

---

[9] The WorkSmart Defendants' uncontested characterization is that Smith's position following the sale was that of "senior business advisor" to WorkSmart. (Pl.'s Mot. Summ. J. Ex. 2, 34.)

LLC's vendor liabilities (Pl.'s Mot. Summ. J. Ex. 2, 8) and issues invoices to WorkSmart Charlotte, LLC's clients.  (Pl.'s Mot. Summ. J. Ex. 2, 9.)

## III.

## LEGAL STANDARD

{36}    "The trial court must grant summary judgment upon a party's motion when there is no genuine issue as to any material fact and any party is entitled to a judgment as a matter of law."  *Wal-Mart Stores East, Inc. v. Hinton*, 197 N.C. App. 30, 37, 676 S.E.2d 634, 641 (2009) (quoting *Carter v. W. Am. Ins. Co.*, 190 N.C. App. 532, 536, 661 S.E.2d 264, 268 (2008)).  "Summary judgment is appropriate if: (1) the non-moving party does not have a factual basis for each essential element of its claim; (2) the facts are not disputed and only a question of law remains; or (3) if the non-moving party is unable to overcome an affirmative defense offered by the moving party."  *Id.*

## IV.

## ANALYSIS

## A.

## SUCCESSOR LIABILITY

{37}    Plaintiff alleges that the WorkSmart Defendants, as purchasers of "substantially all of the assets of Techie," are liable for damages incurred as a result of Techie's breach of contract with Plaintiff (1) as the "mere continuation" of Techie (Compl. ¶ 36); or, alternatively, (2) because "Techie has effectively been merged into WorkSmart and/or WorkSmart Charlotte."  (Compl. ¶ 37.)  Plaintiff further alleges—as its basis for establishing joint and several liability of both WorkSmart Defendants under either theory—that WorkSmart Charlotte, LLC is an alter ego of WorkSmart, Inc.  (Compl. ¶¶ 39–40.)

{38}    As a general rule, "the purchaser of all or substantially all the assets of a corporation is not liable for the old corporation's debts."  *G.P. Publications, Inc. v. Quebecor Printing – St. Paul, Inc.*, 125 N.C. App. 424, 432, 481 S.E.2d 674, 679 (1997) (citing *Budd Tire Corp. v. Pierce Tire Co.*, 90 N.C. App. 684, 687, 370 S.E.2d 267, 269 (1988)).

{39}    At a minimum, imposition of successor liability in North Carolina requires a transfer of assets from a predecessor corporation to the successor. *Morgan v. Cavalier Acquisition Corp.*, 111 N.C. App. 520, 539, 432 S.E.2d 915, 926 (1993) (citing *Statesville Stained Glass, Inc. v. T.E. Lane Constr. & Supply Co.*, 110 N.C. App. 592, 599, 430 S.E.2d 437, 441 (1993)).

{40}    The four widely recognized exceptions to the general rule against successor liability in modern practice are: (1) where the purchasing corporation expressly or impliedly assumes debts or liabilities of the seller; (2) "where the transfer amounts to a *de facto* merger of the two corporations"; (3) where the transfer is conducted to defraud the seller's creditors; or (4) where the purchaser is a "mere continuation" of the seller "in that the purchasing corporation has some of the same shareholders, directors, and officers." *G.P. Publications*, 125 N.C. App. at 432–33, 481 S.E.2d at 679 (citing *Budd Tire Corp.*, 90 N.C. App. at 687, 370 S.E.2d at 269; *see also W. Tex. Refinery & Dev. Co. v. Comm'r*, 68 F.2d 77, 81 (10th Cir. 1933) (enunciating and tracking early case history for these four exceptions); 3 James D. Cox & Thomas Lee Hazen, *Cox & Hazen on Corporations*, § 22.08 (2d ed. 2003). Plaintiff asks the Court to impose liability upon the WorkSmart Defendants based on either the de facto merger exception or the "mere continuation" exception to the general rule against successor liability.

1.

"MERE CONTINUATION"

{41}    North Carolina has embraced the traditional rule of "mere continuation" successor liability that "'a corporate successor is the continuation of its predecessor if only one corporation remains after the transfer of assets and there is identity of stockholders and directors between the two corporations.'" *G.P. Publications*, 125 N.C. App. at 434, 481 S.E.2d at 680 (quoting *Ninth Ave. Remedial Grp. v. Allis-Chalmers Corp.*, 195 B.R. 716, 724 (N.D. Ind. 1996) (citing *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir. 1992))). North Carolina courts consider two additional factors in determining whether a successor corporation is the "mere continuation" of a predecessor: "(1) inadequate

consideration for the purchase; and (2) lack of some of the elements of a good faith purchaser for value." *Id.* at 435, 481 S.E.2d at 680 (citing *Budd Tire*, 90 N.C. App. at 687, 370 S.E.2d at 269).

{42}    The *G.P. Publications* court acknowledged the possibility that, "[i]n fact, a purchaser conceivably could be found to be the corporate successor of the selling corporation even though there is no continuity of ownership." 125 N.C. App. at 435, 481 S.E.2d at 680 (citing *L.J. Best Furniture Distrib. v. Capital Delivery Serv.*, 111 N.C. App. 405, 432 S.E.2d 437 (1993)). Plaintiff submits that this language from *L.J. Best Furniture* loosened the traditional continuity-of-ownership requirement for "mere continuation" liability.

{43}    *L.J. Best Furniture* involved a transfer of assets from Capital Delivery Service, Inc. ("Capital") to Duncan Transportation, Inc. ("Duncan"). *L.J. Best Furniture*, 111 N.C. App. at 406, 432 S.E.2d at 439. When Capital became insolvent, the wife of Capital's fifty-percent owner formed Duncan, the only shareholders of which were herself, her son, and her nephew—all former Capital employees. *Id.* Duncan then proceeded to engage in the trucking business formerly undertaken by Capital, leveraging the latter's right to lease vehicles, and using former Capital staff and management to serve some of the same customers. *Id.* at 407–08, 432 S.E.2d at 439–40. The plaintiff sought to recover from Duncan for Capital's breach of contract prior to the transfer. *Id.* at 407, 432 S.E.2d at 439. The Court of Appeals vacated the trial court's order of summary judgment *in favor of the plaintiff*, holding that a number of disputed issues of material fact persisted, and remanded for trial. *Id.* at 409, 432 S.E.2d at 441. In *L.J. Best Furniture*, the court opined: "[e]ven if there was no evidence of a formal purchase of Capital, the evidence must show Duncan, Inc. has acquired Capital's assets without sufficient consideration and is thus a mere continuation of Capital. Because this fact is determinative of Duncan['s] liability, it is material to this action." *Id.* at 408, 432 S.E.2d at 440.

{44}    Plaintiff reads the court's opinion in *L.J. Best* too broadly. In light of the narrowly circumscribed factual circumstances giving rise to the court's decision

in *L.J. Best Furniture*—i.e., intra-family, de facto transfer of assets absent a "formal purchase," without sufficient consideration—this Court declines to speculate as to other possible factual scenarios that might invoke "mere continuation" liability without continuity of ownership.

{45}   As a threshold matter, the Court determines that Plaintiff has failed to establish continuity of ownership or directorship between Techie and WorkSmart. The Court finds nothing sufficiently compelling in Plaintiff's evidence to support a departure from the strict continuity requirement of the traditional "mere continuation" test, such as that suggested by *L.J. Best Furniture*. *See id.* As previously noted, *supra* paragraph 30, there is no evidence before the Court that Smith, or any other person, was an owner or director of both Techie (pre-APA) and WorkSmart (either pre- or post-APA). Furthermore, Plaintiff cites no legal authority to support its argument that WorkSmart's "variable payments" to Steaksauce created an equitable interest for Smith in any of the WorkSmart entities.

{46}   Plaintiff further argues, in support of "mere continuation" liability, that the WorkSmart Defendants' payment of $45,000 to Techie was inadequate consideration for the purchased assets.[10]

{47}   In a contract action, the general rule regarding adequacy of consideration is that "when parties have dealt at arms length and contracted, the Court cannot relieve one of them because the contract has proven to be a hard one." *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 722, 127 S.E.2d 539, 543 (1962). It follows that "[w]hether or not the consideration is adequate to the promise, is generally immaterial in the absence of fraud." *Id.* (citation omitted).

{48}   In *North Carolina Nat'l Bank v. Evans*, 296 N.C. 374, 250 S.E.2d 231 (1979), the North Carolina Supreme Court distinguished adequacy of consideration under the law of contract from the standard applied to fraudulent conveyances. *Id.* at 378, 250 S.E.2d at 234. The Supreme Court noted that "different policy

---

[10] *See L.J. Best Furniture*, 111 N.C. App. at 408, 432 S.E.2d at 440; *and* paragraph 43, *supra*.

considerations come into play when the transaction involves the interests of a creditor who is not a party to the transaction," *id.*, explaining that

> [a]s against such creditors "the price must be sufficient in itself . . . , without the aid of their acceptance, for no such acceptance exists." Since the creditor has no control over the amount of consideration which his debtor will accept in relinquishing assets, the law requires that the debtor receive "a *fair* and *reasonable* price, according to the common mode of dealing between buyers and sellers."

*Id.* (quoting *Fullenwider v. Roberts*, 20 N.C. 420 (1839)). The Supreme Court concluded that the principle of fair and reasonable consideration

> does not mean . . . the debtor should [be] paid every dollar the [property] was worth, but he "should [be] paid a reasonably fair price— such as would indicate fair dealing, and not be suggestive of fraud." Such a requirement prevents a debtor from placing his assets beyond the reach of his creditors by transfers to friendly parties for nominal considerations.

*Id.* at 378–79, 250 S.E.2d at 234 (quoting *Austin v. Staten*, 126 N.C. 783, 36 S.E. 338 (1900)).

{49}    WorkSmart's hand in directing payment to Wachovia suggests that WorkSmart was aware of the impact the APA might have on Techie's creditors. By issuing the $45,000 payment jointly to Techie and Wachovia, WorkSmart sought to address the possibility that Smith or Steaksauce might renege on their obligation to one of Techie's primary creditors. The transaction between WorkSmart and Techie does not appear to be the kind of "transfer[] to friendly parties" articulated in *Evans*, that should prompt heightened scrutiny by this Court. *Id.* While our case law does not suggest that pleading "mere continuation" should trigger the *Evans* court's fraudulent-conveyance analysis,[11] this Court nevertheless considers the

---

[11] North Carolina's statutory provisions concerning fraudulent conveyances have since been redrafted and encoded at N.C. Gen. Stat. §§ 39–23.1, *et seq. Evans*, however, remains good law regarding the basic principle underlying the "fair and reasonable price" analysis. *See, e.g., Estate of Graham v. Morrison*, 168 N.C. App. 63, 68, 607 N.C. App. 295, 299 (2005) (citing *Evans* for the proposition that "[w]hat constitutes valuable consideration depends upon the context of a particular case").

*Evans* standard persuasive in determining whether a heightened level of scrutiny should be applied in evaluating the claim of successor liability in this case.

{50}    The Court holds that WorkSmart's payment of $45,000 plus contingent "variable payments" is not wholly inadequate in the context of a purchase and sale of assets by a financially distressed seller to a wary purchaser.[12]  Thus, the most favorable interpretation of Plaintiff's evidence fails to yield "mere continuation" liability in the traditional continuity-of-ownership analysis, or under the more flexible approach considered by the court in *L.J. Best Furniture*, 111 N.C. App. at 408, 432 S.E.2d at 440, which could invite the Court to engage in heightened scrutiny of the actual consideration paid under the APA.

2.

THE DE FACTO MERGER DOCTRINE

{51}    Plaintiff also argues that the WorkSmart Defendants are liable because "Techie has effectively been merged into WorkSmart and/or WorkSmart Charlotte LLC." (Compl. ¶ 37.)  Specifically, Plaintiff urges an application of the equitable doctrine of de facto merger because, by purchasing substantially all of Techie's assets, the WorkSmart Defendants reduced Techie to a worthless shell that ceased all operations.[13]  Plaintiff further argues that WorkSmart continued Techie's business operations using Techie assets and staff; that the APA was financed, in part, by exchange of WorkSmart stock; and that WorkSmart assumed only the liabilities necessary for uninterrupted operation of Techie's former business.  (Pl.'s Br. Supp. Mot. Summ. J. 15–17.)

---

[12] On this point, the WorkSmart Defendants present evidence, not rebutted by Plaintiff, that their decision to jointly issue the upfront payment to Wachovia was out of mistrust of Smith rather than an effort to keep Techie assets beyond the reach of other creditors.  In an e-mail message to Ricky Ayers on February 23, 2010, Unger writes: "[s]ince [Smith] owes money to folks personally, we should probably do the joint-check . . . in TECHie's name as well as Wachovia."  (Defs.' Mot. Summ. J. Ex. 1-C 1.)

[13] Plaintiff notes, in support of this argument, that WorkSmart admits that its employees used the term "shell corporation" when referring to Techie successor Steaksauce.  (Pl.'s Mot. Summ. J. Ex. 3 ¶ 27.)

{52}     Before analyzing the applicability of de facto merger to the facts of this case, the Court first considers the distinction between formal merger and asset purchase under North Carolina law.

{53}     Merger is, "in essence, the transfer of the property and business of one corporation to another in exchange for securities or cash issued by the purchaser to shareholders of the seller." *Cox & Hazen on Corporations* § 22.11.  Formal merger in North Carolina is governed by Article 11 of the North Carolina Business Corporation Act,[14] and requires adoption (by the boards of directors of both merged corporations) and approval (by voting shareholders of each merged corporation) of a plan of merger.  N.C. GEN. STAT. § 55-11-01(a) (2012).  The surviving corporation retains all liabilities of both merged entities.  § 55-11-06(a)(3).

{54}     Article 12 of the Business Corporation Act (the "Act") provides:

> [a] corporation may sell, lease, exchange, or otherwise dispose of all, or substantially all, of its property, otherwise than in the usual and regular course of business, on the terms and conditions and for the consideration determined by the corporation's board of directors, if the board of directors proposes and its shareholders approve the proposed transaction.

§ 55-12-02(a).

{55}   The official comment to the statute addresses the meaning of "substantially all" in the context of a corporate asset transfer by explaining that "[a] sale of all the corporate assets other than cash or cash equivalents is normally the sale of 'all or substantially all' of the corporation's property."  § 55-12-01 cmt. n.1.  The comment further notes that the phrase "all or substantially all . . . was added merely to make it clear that the statutory requirements [for sale of substantially all assets] could not be avoided by retention of some minimal or nominal residue of the original assets."  *Id.*[15]

---

[14] Encoded as Chapter 55 of the North Carolina General Statutes, the Act constitutes North Carolina's adoption of the Revised Model Business Corporation Act (1984).  N.C. GEN. STAT. § 55-1-01 cmt. (2012).

[15] The comment does not shed further light on when the statutory requirements of Article 12 of the Act should apply to the sale of some, but not all, of a corporation's assets outside

{56}     De facto merger is (1) "a judicial reply to situations in which an assets transaction resulted in the transferor corporation being financially incapable of satisfying the claims of its creditors or the victims of its torts," 20 Am. Jur. Proof of Facts 2d 609 § 1 (2012); and (2) an equitable means employed by some jurisdictions to protect dissenting shareholders' rights where an asset sale conducted without shareholder approval amounts to a merger in fact.  1-25 *Robinson on North Carolina Corporation Law* § 25.04 (2011).  The doctrine has been applied by a minority of jurisdictions.  *See Cox & Hazen on Corporations* § 22.07 (discussing de facto merger as a minority rule) ("A far greater number of jurisdictions, including Delaware, refuse to embrace the de facto merger doctrine."); *see also* 20 Am. Jur. Proof of Facts 2d 609 § 1 (compiling cases from eleven states that recognize de facto merger).

{57}     While the North Carolina Court of Appeals has previously acknowledged the existence of the de facto merger exception in dicta, *see G.P. Publications*, 125 N.C. App. at 432–33, 481 S.E.2d at 679; *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 791–92, 561 S.E.2d 905–09 (2002); *Coffin v. ISS Oxford Servs., Inc.*, 114 N.C. App. 802, 804, 443 S.E.2d 352, 353 (1994); *Morgan*, 111 N.C. App. at 539, 432 S.E.2d at 925–26; *Budd Tire Corp.*, 90 N.C. App. at 687, 370 S.E.2d at 269, this Court inherits no binding authority as to how, and under

the ordinary course of business.  Scholarly review of court decisions in other jurisdictions that have adopted the Revised Model Business Corporation Act, however, suggests that asset transfers must be assessed both qualitatively and quantitatively to determine whether they constitute "substantially all" of the seller's assets.  *See Cox & Hazen on Corporations* § 22.05.  For example, while Cox and Hazen suggest that an eighty percent rule of thumb borrowed from tax law may be appropriate to such a determination, *id.* (citing I.R.C. § 322(b) (2000)), they note that the Delaware Court of Chancery held, in *Katz v. Bregman*, 431 A.2d 1274 (Del. Ch. 1981), that a sale of fifty-one percent of corporate assets required stockholder approval due to "the extraordinary change in the corporation's business that would follow the sale."  *Id.* (discussing *Katz*).  As advanced by Cox and Hazen, the essential distinction between an asset sale that remains a discretionary decision of the board of directors and one requiring shareholder approval is whether the decision merely "shift[s] assets to new areas" or constitutes a "prelude to a structural change in the nature of investment, such as sales that are a prelude to liquidation, for which shareholder approval is necessary."  *Id.*  In any case, Plaintiffs have nowhere alleged that the APA, if in fact a sale of "substantially all" Techie assets to the WorkSmart Defendants, violated the requirements for such a sale under Article 12 of the Act.

what facts, the doctrine should apply. The Court, therefore, examines Plaintiff's de facto merger claim as a matter of first impression in North Carolina.

{58} Long before the adoption of the Business Corporation Act, the North Carolina Supreme Court applied successor liability, under the "trust fund" doctrine, to a debtor corporation's sale of substantially all its assets in exchange for shares in the purchasing corporation where the transaction left the seller's creditors unsatisfied. *See McIver v. Young Hardware Co.*, 144 N.C. 478, 487–88, 57 S.E. 169, 172 (1907). *McIver* imposed successor liability upon the purchaser corporation as an extension, in equity, of the seller's fiduciary duty toward its existing creditors:

> When there are debts outstanding, "it becomes the duty (of the directors) of the [insolvent] corporation to preserve its assets and administer them for the benefit of the creditors. A court of equity will then treat the assets as a trust fund. If they have been distributed among stockholders, or gone into the hands of others than bona fide creditors or purchasers (for value), a court of equity will follow them and compel them to be applied to the satisfaction of the debts."

*Id.* at 488, 57 S.E. at 172 –73 (quoting *Sidell v. Missouri Pac. Ry.*, 78 F. 724, 727 (2d Cir. 1897)); *see also Everett v. Carolina Mortg. Co.*, 214 N.C. 778, 784, 1 S.E.2d 109, 113 (1939) ("The principle that a corporation may not transfer all of its assets to other than a *bona fide* purchaser for value, without provision for the payment of its creditors, is very generally accepted." (citations omitted)).

{59} North Carolina's iterations of the "trust fund" doctrine have not touched upon the question of whether North Carolina courts would hold a purchaser liable to a seller's creditors based on the purchaser's *mere knowledge* (i.e., actual or constructive) of the seller's outstanding debts where (1) no claims against the seller are pending at the time of the asset sale and (2) valuable consideration is paid for the assets. *See Everett*, 214 N.C. at 785, 1 S.E.2d at 113 (holding that the transferee corporation could be held liable under the "trust fund" doctrine where the creditor's action against the transferor had begun before the asset transfer, where the transferee was wholly owned by the transferor, and where no valuable consideration was exchanged); *see also Budd Tire Corp.*, 90 N.C. App. at 689, 370

S.E.2d at 270 (citing generally to *Everett*) ("When a corporation purchases all or substantially all of the assets of another corporation *for grossly inadequate consideration*, the transfer will be deemed fraudulent as to the selling corporation's creditors, regardless of whether the parties had the actual intent to defraud." (other citations omitted) (emphasis added)).

{60}    In its traditional form, "[t]he de facto merger exception emphasizes the continuity of the acquired company's shareholders in the surviving enterprise." *Cox & Hazen on Corporations* § 22.08; *see also Matter of New York City Asbestos Litig.*, 789 N.Y.S.2d 484, 486–89 (N.Y. App. 1st Div. 2005) (holding that de facto merger could not apply where there was insufficient evidence of (1) continuity of ownership, (2) cessation of ordinary business operations, and (3) dissolution of the selling corporation as soon as possible after the transaction); *Kaleta v. Whittaker Corp.*, 583 N.E.2d 567, 571 (Ill. App. Ct. 1st Dist. 1991) ("[W]ithout continuity of shareholders, it does not appear just to require the successor corporation to assume the liabilities of the predecessor when it has already paid a substantial price for the assets of the predecessor." (quotation and citation omitted)); *Fish v. Amsted Indus., Inc.*, 376 N.W.2d 820, 824 (Wis. 1985) ("A court merely need determine that the defendant, despite business transformations, is substantially the same as the [transferor]." (quotation and citation omitted)).

{61}    De facto merger, furthermore, "in its most orthodox application arises when stock, rather than cash, is the purchase consideration and the selling corporation dissolves shortly after the acquisition so that the stock is distributed to its shareholders." *Cox & Hazen on Corporations* § 22.08; *see also Fish v. Amsted Indus.*, 376 N.W.2d at 824 ("The key element in determining whether a merger or de facto merger has occurred is that the transfer of ownership was for stock in the successor corporation rather than cash." (citations omitted)); *Franklin v. USX Corp.*, 105 Cal. Rptr. 2d 11, 17 (Cal. Ct. App. 1st Dist. 2001) ("The crucial factor in determining whether a corporate acquisition constitutes either a de facto merger or a mere continuation is the same: whether adequate cash consideration was paid for

the predecessor corporation's assets.");[16] *Rondy & Co. v. Plastic Lumber Co.*, C.A. No. 25548, 2011 Ohio App. LEXIS 4722, at *7 (Ohio Ct. App. Nov. 9, 2011) ("[A] transfer of assets for stock is the sine qua non of de facto merger." (citing *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1132 (Ohio 1993)).

{62}    Plaintiff advances an unpublished case from the United States Court of Appeals for the Fourth Circuit, decided under Virginia law, *Acme Boot Co. v. Tony Lama Interstate Retail Stores, Inc.*, Nos. 90-2621, 90-2630, 90-2637, 1991 U.S. App. LEXIS 4805 (4th Cir. Mar. 26, 1991) (per curiam), to support application of de facto merger to the facts of the present case.

{63}    The traditional elements of the de facto merger doctrine, as set forth in *Acme Boot*, are: (1) continuation of the management, personnel, physical location, assets, and general business operations of the seller; (2) continuity of shareholders achieved by paying for the acquired assets via transfer, to the seller's shareholders, of shares in the purchasing corporation; (3) the seller "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible"; and (4) assumption by the purchaser of "those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller." *Acme Boot Co.*, 1991 U.S. App. LEXIS 4805, at *8 (citing *Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1457–58 (11th Cir. 1985) (other citations omitted)); *see also Keller v. Clark Equip. Co.*, 715 F.2d 1280, 1291 (8th Cir. 1983), *cert. denied*, 464 U.S. 1044 (1984) (setting forth same elements of de facto merger).

{64}    *Acme Boot* involved a dispute between two trade creditors of a distressed retailer, Desperados American Wear, Inc. ("Desperados"). *Acme Boot Co.*, 1991 U.S. App. LEXIS 4805, at *2. In February 1989, the plaintiff ("Acme") sued Desperados and its owner, Robert Davies ("Davies"), on Desperados' debt to

---

[16] The California Court of Appeals noted, "it appears to us that the mere continuation theory swallows up the de facto merger theory, because once the two mere continuation elements are satisfied there is no need to further consider the additional elements of the de facto merger theory in establishing successor liability." *Franklin*, 105 Cal. Rptr. 2d at 17 n.6.

Acme and obtained a default judgment against both defendants in May 1989. *Id.* During the pendency of Acme's suit, in April 1989, Acme and creditor Tony Lama Interstate Retail Stores, Inc. ("Lama") entered into an agreement whereby Lama would pay cash for some of Desperados' trade fixtures and its trade name, and would assume leases on four Desperados stores. *Id.* Around the same time, Lama separately agreed to hire Davies under a five-year contract that included "incentive compensation" based on net sales of the four stores. *Id.* at *2–3. Lama paid Davies for certain trade fixtures by joint check, which Davies signed over to a bank holding a security interest in them; Lama also paid Davies $10,000, which Davies signed back over to Lama in payment of Desperados' trade debt with Lama. *Id.* at *3. When Lama took over the existing Desperados stores, it hired all but one of the stores' managers. *Id.* Lama installed new cash registers and placed "Tony Lama" banners on storefronts; employees wore Lama tags and answered the phone "Tony Lama"; however, the permanent signs outside the stores continued to say "Desperados" for approximately seven months, and receipts may have borne the Desperados name during the same period following the sale. *Id.* at *4.

{65}    As the *Acme Boot* court noted in its per curiam opinion, Davies "continued to operate as manager for a short time . . . but reported to Lama management," and his duties soon "changed from management to marketing." *Id.* Acme filed suit seeking to join Lama to the default judgment against Desperados based upon de facto merger or "mere continuation." *Id.* at *4–5. The trial court granted summary judgment to Acme, holding Lama liable as successor to Desperados on these facts. *Id.* at *5.

{66}    In reversing, the Fourth Circuit held that the trial court had improperly granted summary judgment to Acme based on de facto merger by relying on disputed facts in making its ruling. *Id.* at *18. Two key facts in dispute cited by the court were "whether [Davies'] employment agreement could be construed to be some form of ownership, thus meeting the continuity of ownership requirement," and "whether there was continuity of the enterprise given that . . .

Lama management ran the business from its . . . office after the purchase, while the in-store changes were relatively minor." *Id.* at *10.

{67}    Without further addressing the question of whether different facts would merit application of de facto merger in North Carolina, the Court holds that the evidence before it does not satisfy the traditional iteration of the doctrine as set forth in *Acme Boot,* and as advanced by Plaintiff.

{68}    First, although WorkSmart retained most of Techie's employees (including Smith, whose contract was for a limited term of six months) and purchased other Techie assets, Plaintiff has not shown continuity of Techie management, physical location, or business operations.[17]  While the Fourth Circuit held in *Acme Boot Co.* that the trial court's order of summary judgment in favor of the *plaintiff* in that case was inappropriate because it was based on factually disputed evidence as to the nature of Davies' employment with Lama, *Acme Boot Co.,* 1991 U.S. App. LEXIS 4805, at *18, this Court holds that Plaintiff's evidence of Smith's employment with WorkSmart alone is insufficient to establish continuity of former Techie management at WorkSmart following execution of the APA.  Second, Plaintiff has not demonstrated that the WorkSmart Defendants paid for Techie's assets by an exchange of WorkSmart shares.  Third, while Techie appears to have ceased ordinary business operations around the time the APA was executed, Plaintiff does not present any evidence that Techie (i.e., Steaksauce) liquidated or dissolved itself following the transaction.  Lastly, Plaintiff has not shown that the WorkSmart Defendants assumed the liabilities and obligations "ordinarily necessary" for the uninterrupted continuation of Techie's business operations.  This deficiency is illustrated by the fact that WorkSmart elected to continue using its existing offices as the base from which to leverage its newly acquired Techie assets, and specifically declined to assume Techie's leasehold—the liability at the heart of this litigation.

---

[17] As previously noted at footnote 9, the most generous reading of Plaintiff's allegations and evidence establish only that Smith "continued to oversee former Techie clients" while employed by WorkSmart for a limited period, not that Smith was a manager, officer, director, or shareholder of WorkSmart Charlotte, LLC or WorkSmart, Inc.

{69}    In encouraging the Court to adopt and apply the de facto merger doctrine, Plaintiff cites to various additional interpretations of the doctrine that reach beyond fixed elements or determinative factors.

{70}    For example, in *Greater Potater Harborplace, Inc. v. Jenkins*, No. 90-1462, 1991 U.S. App. LEXIS 11015 (4th Cir. May 31, 1991) (unpublished per curiam opinion applying Maryland law), the court stated that, under de facto merger, "liability [should be] imposed even when the predecessor corporation has not been terminated, since one should not be able to escape liability with such a convenient artifice." *Id.* at *18–19 (citing *Arnold Graphics Indus., Inc. v. Indep. Agent Ctrs., Inc.*, 775 F.2d 38, 42 (2d Cir. 1985). Context suggests, however, that the Circuit Court's statement should not be construed as applicable to the present facts. *Greater Potater* involved unrebutted evidence of a high degree of continuity between a persisting shell entity and the successor to its fundamental enterprise. *See id.* at *17 (noting that defendant Greater Potater "has continued to operate, albeit in expanded form, using the same equipment, many of the same practices, and under the same management as Thrasher's, Inc."). In the course of its review of the trial court's substitution of Greater Potater as defendant (under Rule 25(c) of the Federal Rules of Civil Procedure), the court's analysis arguably conflates "mere continuation" and de facto merger as a composite whole. *See id.* at *16 ("[L]iability will be imposed on successor corporations when, *inter alia*, the transaction amounts to a *de facto* merger, and the purchasing corporation is a mere continuation of the selling corporation.").

{71}    Other cases cited by Plaintiff appear equally inapplicable here. *See Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D.N.Y 1985) (denying motion to dismiss successor claim under de facto merger exception where the complaint "clearly describes the wholesale transformation of one company, Carla, into another, Maglia"); *Menacho v. Adamson United Co.*, 420 F. Supp. 128, 137 (D.N.J. 1976) (acknowledging decisions construing successor liability more liberally where predecessor is unavailable to compensate tort victims, but nonetheless granting summary judgment to successor manufacturer on plaintiff's personal injury claims,

noting that "none of these decisions calls for the imposition of liability on a purchaser where the seller retains no control"); *AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.*, 22 A.D.3d 750, 752 (N.Y. App. Div. 2d Dep't 2005) (holding that elements of de facto merger "are analyzed in a flexible manner that disregards mere questions of form and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of the predecessor," and affirming the trial court's ruling that plaintiff had made a sufficient showing of de facto merger where the successor: paid for the predecessor's assets by stock transfer; assumed all of predecessor's real property, customer obligations, and business insurance policy; hired some of predecessor's management personnel; and intended the asset purchase to constitute a liquidation of the predecessor).

{72}   Plaintiff makes much of WorkSmart's use of the term "merger" in announcing its acquisition of Techie assets, suggesting that by using the term in its dealings with employees and clients WorkSmart sought to continue Techie's business without accepting the potential liabilities.

{73}   The uncontroverted evidence, however, is that WorkSmart sought to retain Techie customers by assuring them that, by the application of WorkSmart's greater resources, it would improve upon the services formerly provided by Techie, and there is no evidence that WorkSmart premised its pitch to these customers on the notion that WorkSmart would merely continue Techie's business.[18] Although Techie's contracts with customers included non-assignment provisions, Plaintiff does not challenge WorkSmart's assertion that the customers, as willing parties to the contracts, effectively ratified any such assignments by agreeing to do business with WorkSmart in Techie's stead.

---

[18] The Court notes with approval the observation of the Colorado Court of Appeals, in *Johnston v. Amsted Indus., Inc.*, 830 P.2d 1141 (Colo. Ct. App. 1992) (affirming trial court's refusal to impose products liability on successor) that where a successor pays consideration for a predecessor's goodwill, "[t]o require the successor to assume liability . . . on the basis of acquired good will would be, in effect, requiring the successor to pay twice for that good will." *Id.* at 1146 (citations omitted).

{74}    While some courts have considered a successor's "holding out" to third parties to be persuasive evidence of continuity of enterprise,[19] this Court holds that WorkSmart's use of the term "merger" in its dealings with customers and employees is insufficient to support successor liability where, as in this case, other facts fail to support the equitable theories Plaintiff advances.  Plaintiff was on notice from Smith, virtually from the time of the execution of the APA, that Smith had "found another company to service . . . customers and take over" accounts receivable. (Def.'s Mot. Summ. J. Ex. 10.)  Smith added in the same e-mail message (to Plaintiff's agent) that Techie's monetary return from the APA "was not even enough to pay off [Smith's] bank loans," and announced his intention to abandon Suite A-1 in no uncertain terms, without intimating that the asset purchaser might assume Techie's lease obligation to Plaintiff.  (Def.'s Mot. Summ. J. Ex. 10.)  Plaintiff has not demonstrated that it made any effort to protect its interests following this e-mail communication from Smith, or that it sought clarification regarding the nature of WorkSmart's asset purchase and what, if any, of Techie's obligations to Plaintiff the purchaser would assume in the APA.  Although WorkSmart insisted upon issuing the $45,000 payment jointly to Techie and Wachovia, perhaps as a hedge against potential litigation that WorkSmart viewed as a risk to the asset purchase, Plaintiff points to no authority suggesting that an arms-length asset purchaser shares a debtor-seller's duty to treat the seller's third-party creditors fairly or equally, as would be the case in the application of the "trust fund" doctrine.

---

[19] The totality of circumstances test for de facto merger adopted by both Alabama, *see American Standard, Inc. v. Goodman Equip. Co.*, 578 So. 2d 1083, 1086 n.3 (Ala. 1991) and Michigan, *see Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873 (Mich. 1976) suggests that a defendant's holding out to others of the continuity of enterprise—i.e., "[b]asic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations and . . . the [seller's] name," *American Standard*, 578 So 2d at 1086 n.3 (quoting *Turner*, 244 N.W.2d at 883–84)—could be sufficient to satisfy the continuity element.  The remaining factors for de facto merger as set forth in these cases, however, mirror those enumerated in *Acme Boot*.  *See id.*; *Acme Boot*, 1991 U.S. App. LEXIS 4805, at *8.  Thus, even if the Court entertained such "holding out" as sufficient to establish continuity, Plaintiff's evidence would still fall short of the traditionally determinative measure of continuity of management, personnel, physical location, assets, and general business operations of the seller.  *See Acme Boot*, at *8.

{75}    In light of the fact that no North Carolina court has previously applied de facto merger to an asset purchase transaction, Plaintiff does not offer any compelling justification for adopting a more expansive version of the doctrine than that enunciated by the traditional four-elements test, with continuity of ownership being determinative. *See Cox & Hazen on Corporations* § 22.08 ("The de facto merger exception emphasizes the continuity of the acquired company's shareholders in the surviving enterprise.").

{76}    Policy implications also weigh heavily against imposition of successor liability under the facts of this case. The market for substantial asset purchases encourages the efficient allocation of business assets away from failing entities and into the hands of stronger or better capitalized competitors. Absent plausible evidence of irresponsible dealings, fraud or wrongful advantage, to impose successor liability on a transaction conducted pursuant to a due diligence inquiry, and circumscribed by clearly defined contractual terms, would unnecessarily discourage good-faith asset purchases of substantially all assets of a corporation. While a purchasing entity would be well-advised to avoid confusion in its public characterizations of an asset purchase, it would seem equally unreasonable for our courts to place a potential cloud over every such transaction merely because a buyer or its representative uses inartful language in referring to the transaction, or because the seller neglects to satisfy all of its creditors.

{77}    For the foregoing reasons, the Court **GRANTS** the WorkSmart Defendants' Motion for Summary Judgment as to Plaintiff's claim for successor liability.

{78}    In the absence of any remaining substantive basis for liability of WorkSmart Charlotte, LLC, the Court further **GRANTS** the WorkSmart Defendants' Motion for Summary Judgment as to Plaintiff's corporate veil-piercing claim.

IV.

CONCLUSION

{79}    For the reasons stated herein, the Court **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** the WorkSmart Defendants' Motion for Summary Judgment.  Accordingly, the Court orders entry of judgment in favor of Defendants WorkSmart, Inc. and WorkSmart Charlotte, LLC as to all of Plaintiff's claims.

**SO ORDERED**, this the 25th day of May, 2012.